[No. H017310. Sixth Dist. Aug. 6, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
EDWARD VARGAS, Defendant and Appellant.

508

510

514

COUNSEL

Bill Lockyer, Attorney General, Robert R. Anderson and Ronald A. Bass, Assistant Attorneys General, Stan M. Helfman and John R. Vance, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

Kathy M. Chavez and Tara Mulay for Defendant and Appellant.

**OPINION**

**PREMO, Acting P. J.**—Defendant Edward Vargas was charged by grand jury indictment with conspiracy to commit murder, robbery, assault with a deadly weapon, arson, burglary, extortion, intimidation of witnesses, terrorist threats, escape, possession of concealable firearm by a convicted felon,

and distribution of heroin, cocaine, phencyclidine (PCP), and methamphetamine (count 1), and the murder of Elias Rosas (Pen. Code, § 187;[1] count 12). Count 1 alleged 96 overt acts. The indictment further alleged that counts 1 and 12 were committed for the benefit of, at the direction of, and in association with a criminal street gang, with the specific intent to promote, further, and assist in criminal conduct by gang members, within the meaning of section 186.22, subdivision (b)(1).

The indictment was amended on July 8, 1996, to add the allegation that defendant had suffered two prior felony convictions.

Defendant pleaded not guilty and denied the enhancement allegations.

The jury found defendant guilty on both, and also found true the enhancement allegations.

The court sentenced defendant to a total prison term of 60 years to life, as follows: 25 years to life on count 1; a consecutive 25 years to life on count 12; and a consecutive 10-year enhancement for the two prior felony convictions.

We affirm.

## FACTS

### A. *Nuestra Familia*

The Nuestra Familia (NF) is a prison gang that was founded in September 1968 by inmates at the California State Prison San Quentin (San Quentin). NF is a "cold-hearted gang" that commits murders, burglaries, extortion, and other crimes, including selling drugs to raise money for its members. Persons who testify against the NF are killed. Since its founding, NF has become "the most organized prison gang" in the California Department of Corrections (CDC). NF has also, since its founding, extended its influence outside of prison walls to the "streets." NF has a written constitution. The governing body of NF is called the "Mesa."

New NF members receive "schooling" on such subjects as how to construct weapons from found material, how to attack an enemy, and how to build the gang outside prison.

To be eligible for NF membership, a prisoner had to be a member of the "Northern Structure" (NS). NF membership is a lifetime commitment. Leaving the NF is, according to its constitution, an offense punishable by death.

---

[1]Further statutory references are to the Penal Code unless otherwise stated.

Of this lifetime commitment, Ronnie Shelton, an NF member who testified for the prosecution, stated: "Blood in blood out is not written literally into the constitution word for word, although between the lines it is definitely there, that you come into the organization with blood on your hands, preferably murder, if not, any other criminal acts and, for example, a deserter, traitor or coward who decides to defect and leave the organization, blood out is meaning to kill him."

Shelton further testified that although the constitution provides for an automatic death sentence for a traitor (i.e., "an NF who decides to defect, drop out, of the organization"), in practice, there was discretion. Shelton said he could be "considered a traitor because I have defected and I'm testifying." Asked if his defection meant a death sentence, Shelton testified: "Yes. If they ever had an opportunity to get near me they—pretty sure some would try to kill me, and perhaps maybe some wouldn't. It's not carved in stone to kill, because it's upon the individual if he wants to proceed and pursue that hit or just back off, because maybe he just doesn't want to do nothing, maybe he's on the verge of dropping out."

One objective of the NF is "to build the organization on the outside, become self-supporting, work with those in alliance, any and all illegal ventures to build the funds that can be utilized to take care of members behind the walls or drug deals on the streets." Building the organization "on the streets" was important "[t]o promote the organization so others can recognize the powerfulness of the NF, which is basically the umbrella organization for the Northern Structure and, in a sense, directly, indirectly intimidate those with large quantities of drugs or anything that the NF can use to edify their own system."

NF members on the street were expected to contribute money to the NF "bank," which was the NF fund held for the benefit of the NF members. The contributions from individual members were to be made from dealing drugs or getting "contributions" from drug dealers. The NF members on the "street" were under the control of the Regional Security Department (RSD) to whom they were to report.

Murders, or "hits," had to be sanctioned by higher authority. In NF terminology, approval for murder was called a "green light." A NF member who killed another NF member had to be killed.

### B. *Northern Structure*

The Northern Structure was formed by the NF "as a gang under them to take the heat off [the NF]." NF was superior to NS. NF and NS operated for

the common purpose of raising money through crimes to help NF members who are in prison and their families. NF and NS did not use terms like "kill" or "murder" in discussing those acts; they used instead gang language, such as "dealt with" for murder, to conceal the subject of discussion from eavesdroppers.

### C. Testifying NF Members

#### C-1. Ronnie Shelton

In May 1985, Shelton, while serving time at San Quentin, was recruited into the NF by NF member Michael Sosa. Shelton had been a member of the NS prior to his entry to the NF. In December 1990, Shelton became the RSD for San Jose.

After his indictment, Shelton decided to leave the NF and testify for the prosecution. Among the reasons Shelton cited for his decision were exhaustion and the fact that the NF wanted to control his defense. Shelton was facing the death penalty for the murders in which he participated. Shelton pled guilty to four first degree murders (i.e., the murders of Herrera, Valles, Apodaca, and Perez). For these murders, Shelton received a total prison term of 100 years to life. Shelton was 35 years old when he testified. Shelton said he did not expect to live long enough to be eligible for parole, and that, for his participation in the four murders, he deserved to be in prison for the rest of his life.

#### C-2. Louis Chavez

Chavez was recruited into NF from NS in 1989 at the Tehachapi State Prison (Tehachapi) by Joseph Hernandez and Vincent Arroyo. Chavez knew defendant while both of them were at Tehachapi. After the murders of Herrera, Rosas, and Baca, codefendant Lopez told Chavez that Chavez's status in the NF was "on freeze" until Chavez brought them a "body," i.e., committed a murder. Chavez said this meant that "if [he] didn't take care of business, they [the NF] were going to take [him] out," i.e., kill him.

Chavez agreed to testify for the prosecution on condition that he be prosecuted only for the crimes that he had actually committed.

#### C-3. Jerry Salazar

Salazar was recruited into the NS when he was 18 years old. Salazar should have been sent to the California Youth Authority (CYA), but because

he had been paralyzed from a car accident that happened when he was 16, and had been confined to a wheelchair, Salazar could not be accommodated at the CYA; instead, Salazar was sent to the CDC. As part of the NF recruitment process, Salazar was given secret documents that explained the NS and contained the 14 "bonds," or the "dos and don'ts of the Structure." Salazar was active in the NS from 1987 to 1993.

Salazar joined the NF while he was in custody on the present charges. In 1993, while in a holding cell with Arroyo, Salazar was told by Arroyo that he (Arroyo) knew that Salazar had spoken with the San Jose Police Department, but that Salazar should not worry because he (Arroyo) was going to "let it slide because as long as [Salazar] didn't give nobody up on a murder." Salazar, in violation of the NF's code of silence, had told the San Jose Police in 1992 that Guzman, Shelton, Villanueva, and codefendant Lopez were members of the NF.

After the 1993 conversation with Arroyo, Salazar overheard codefendant Trujeque tell codefendant Serna that they would let Salazar slide for a while and then kill him.

In 1993, Salazar, in a written plea agreement, agreed to testify for the prosecution with the understanding that the prosecution would decide whether his sentence was to be life without the possibility of parole, or 50 years to life.

### C-4. *Anthony Guzman*

Guzman joined the NS while in prison in late 1987 or early 1988, after reading the gang's 14 "bonds" and agreeing to live by them.

In August 1992, Guzman fled to Mexico to avoid arrest on the indictment. Guzman's wife, who was also indicted, joined him, but later returned to the United States. Back in the United States, Guzman's wife told Guzman in a telephone conversation that the NF wanted to kill him because they believed that he was cooperating with the district attorney. Guzman explained that he decided to testify for the government because people had died "for nothing"; he was facing the death penalty; his wife was indicted; and his children were upset.

### C-5. *Mendoza, Saldivar, Arroyo*

Other NF members who testified for the prosecution were Carlos Mendoza and Roland Saldivar. NF member Vincent Arroyo pled guilty, pursuant to his plea agreement, but did not testify.

### D. *Conspiracy; Some Overt Acts*

#### D-1. *NF's Hit List*

While at Tehachapi, Chavez, Hernandez, and Pablo "Panther" Pena prepared an NF "hit" list, which was a list of persons who should be killed by the NF for various reasons. Among the people in the list were Tony "Little Weasel" Herrera and James "Jocko" Esparza, both for being gang dropouts, and Carlos Mejias, for having an NF member stabbed. Eli Rosas was not on that list.

When Chavez was paroled, he took the "hit" list with him. Chavez was to give the hit list to Cervantes, but did not. Instead, on July 25, 1991, Chavez gave the hit list, as well as an NF membership list, to his parole officer, E. J. Allen.

#### D-2. *Chavez as Regional Security Director*

While Chavez was in prison, he was ordered by NF Mesa member Hernandez to organize the NF's San Jose regiment. Chavez was to work on the NF's bank. Hernandez told Chavez to "organize it, you know, get it together," and maintain it by "dealing drugs" and "robbing connections." Chavez was to report by letter to Hernandez, who was still in prison, matters relating to the NF.

When Chavez was released on parole on April 19, 1990, he was made the RSD for San Jose. In violation of Hernandez's "orders," Chavez did not report to Hernandez, and did not execute his assignment as directed. Chavez did sell PCP, but did not put the proceeds into the NF "bank."

#### D-3. *Attempted Murder of Mejias*

Chavez testified that Carlos Mejias was not a member of NF. In 1990, the NF wanted to kill Mejias because Mejias, while in prison, had ordered the murder of an NF member, which was carried out.

Salazar testified that at a barbecue prepared by his mother at Kelly Park in San Jose on July 4, 1990, Chavez and another NF member, Lencho Guzman, were present. Victor "Sleepy" Esquibel, who had no gang affiliation, was also present. Although not invited, Mejias showed up. Chavez, who knew that the NF wanted Mejias killed, ordered that Mejias's murder be carried out. Salazar, upon Chavez's direction, provided a knife. When Mejias left, Guzman and Esquibel left with him. Guzman and Esquibel returned about 30

minutes later, and told Salazar that Mejias had been killed. In fact, Mejias survived, and was treated for his wounds.

### D-4. *Shelton Replaces Chavez as RSD*

Shelton testified that while he was in prison, he was instructed by the NF leadership to maintain, upon parole, "the spirit" of NF and "get things organized and make sure there was a regiment established." Shelton was paroled to San Jose on May 27, 1990.

In September 1990, Andrew "Mad Dog" Cervantes, who was from the Stockton NF regiment, called a meeting of the San Jose NF members at the home of Lisa Quevas. Among the NF members present were Shelton, Chavez, and Lopez. Trujeque was not present when the meeting started, but arrived later. The meeting discussed subjects like weapons, who in San Jose had drugs they could steal, and the need for members to keep in communication with NF. Toward the end of the meeting, Cervantes promoted Shelton to RSD and demoted Chavez to second in command.

### D-5. *Lopez Became Second in Command*

Lopez was paroled on September 17, 1990, and became second in command to Shelton by December 1990. Shelton testified that at the NF meetings held in December 1990, "[w]e would discuss who was in communication, who had weapons, drugs, people that needed to be killed, people that had drugs and we wanted perhaps for them to pay rent, a percentage to the organization, things of that nature."

Lopez was arrested for parole violation in May 1991. While in jail, Lopez made Salazar RSD for San Jose. At a meeting at the house of Salazar's mother in June 1991, Rosas, who had just been paroled and who was in charge of security while in prison, believed that he, and not Salazar, should be running the "streets." Salazar told Rosas that Lopez had placed him in charge, "and that was it."

When defendant was paroled in the spring of 1991, Lopez told Salazar from jail to meet defendant. In June 1991, defendant took over control of the NF in San Jose. Chavez told Trujeque that defendant was now in charge of the San Jose NF.

At Lopez's direction, Salazar turned over to defendant the NF "bank" containing between $2,000 and $2,500. Defendant subsequently spent the money on beer, barbecues, and partying. Defendant made Salazar the head of security, which was the second highest position under the RSD.

Defendant was arrested in early July 1991. With defendant's arrest, Salazar took over the "streets." In mid-July 1991, Serna was paroled. Upon Lopez's direction from jail, Serna took over the San Jose regiment from Salazar. Serna testified that Lopez had directed him "[t]o start taking care of business out there, and start building up the bank again, and to rob connections."

### D-6. *Murder of Herrera*

At an NF meeting on November 17, 1990, attended by, among others, Shelton, Lopez, and Trujeque, the NF decided to kill Herrera, a major drug dealer. Herrera had been on the NF hit list. John Blanco, a prominent San Jose drug dealer, who was present at the meeting, said that Herrera had told the police about his activities. Shelton, who had earlier opposed the killing of Herrera because Herrera was assisting the NF by dealing drugs, volunteered to carry out the murder, explaining that the RSD had to set an example.

On November 19, 1990, two days after the meeting, and before Herrera's murder could be carried out, Villanueva, an NF member who was to participate in Herrera's murder, was arrested. Villanueva called Shelton from jail, saying that he believed Herrera had told the police about him.

On November 20, 1990, Shelton met with Lopez to plan Herrera's murder. Lopez was to obtain a gun and Betsy Spencer's Chevette. Shelton, Lopez, and Trujeque discussed the need to kill witnesses. Trujeque suggested they dump Herrera's body in a park.

Later that day, Shelton, Lopez, and Trujeque met Herrera and asked Herrera to get inside Spencer's Chevette. When Herrera was inside the car, Trujeque displayed a .38-caliber revolver. Trujeque got out of the car, pointed the gun at Herrera, and pulled the trigger twice. The gun did not fire. Herrera got out and started to run. Lopez tackled Herrera. Shelton shot Herrera six times in the head. Trujeque fired his gun again. After more misfires, the gun went off.

Spencer testified she suspected her Chevette was involved in Herrera's murder because on Thanksgiving Day, several days after Herrera's murder, it was discovered on fire. Spencer testified that Lopez had borrowed the car and had later told her that the car was stolen from him when he parked it at a 7-Eleven store with the keys in the ignition.

### D-7. *First Attempt to Kill Jasso*

The NF made two attempts to kill Robert Jasso, a bouncer at JP's bar in San Jose, who was not a member of either the NF or the NS. The first attempt was in the spring of 1991, and the second was in the fall of that year.

In December 1990, an NF member reported to Shelton that at Herrera's funeral, Jasso had said: "Fuck Lucky [Shelton], Fuck Lucky, I know [that] Lucky killed [Herrera]." Shelton took Jasso's statements as a show of disrespect to him and the NF. Shelton directed Lopez, his second in command, to have Jasso killed, adding that he wanted all NF members to know that Jasso was to be killed. Shelton said that to let Jasso's disrespect to the NF pass would cause diminution of the NF's power "[a]nd people would just not be willing to cooperate with drug transactions on a respectful level." Jasso's murder was further discussed at the NF meetings in December 1990 and April 1991.

Lopez, Robert Rios, and Jason Vasquez looked for Jasso in late winter or early spring to kill him. However, when they found Jasso, they could not kill him because there were police in the area.

### D-8. *Murder of Valles*

Larry Valles was a PCP dealer. At one NF meeting, the NF discussed the need for Valles "to kick down drugs to the gang." It was decided that Valles needed to be "jacked up."

Shelton subsequently arranged a meeting with Valles. Shelton arrived first. After Valles arrived, Lopez also arrived. Out of Valles's presence, Shelton and Lopez discussed the extortion they were going to make. Valles told Shelton and Lopez that he (Valles) did not pay "rent." Shelton shot Valles between the eyes.

### D-9. *Attempted Murder of Urango*

Lopez authorized the murder of Alphonso "Huero" Urango because Urango "disrespected" the NF by not returning two guns, which belonged to the NF. Urango had said that he would trade the guns for a gram of PCP. Salazar testified that Urango's offer was "an automatic green light." Salazar talked with defendant about Urango's murder. In late June, or early July 1991, NF members, including Salazar, Mendoza, and defendant went to Urango's apartment to kill him. When they arrived, defendant told Saldivar and Mendoza to go to the apartment door, knock on it, and shoot Urango when he opened the door. When Saldivar and Mendoza knocked on the door, Urango's girlfriend, who was eight months pregnant, answered the door. Saldivar and Mendoza did not have the "guts" to kill Urango under the circumstances. No further attempts on Urango's life were made.

### D-10. *Murder of Rosas*

Rosas was a member of the NS.

On December 31, 1983, two masked men broke into the home of Petra Gonzalez, who was the mother of Rosas's girlfriend. Rosas went to Gonzalez's defense.

After the Gonzalez robbery, and while Pena was in prison with Chavez, Pena told Chavez that he (Pena) had robbed Rosas's home, taking drugs. Pena further told Chavez that he (Pena) believed that Rosas had "snitched on him." Chavez stated that even though Rosas was the victim, Rosas should not have told the police because Pena was a member of the NF at the time of the robbery, and Rosas was not.

In late June 1991, after defendant was paroled, defendant discussed the Rosas matter with Salazar. Defendant told Salazar that there was a "green light" on Rosas because Rosas had "snitched on Pablo Pena, Panther." However, defendant wanted to get some confirming "paperwork" first because if he (defendant) was wrong and Rosas was killed, he (defendant) would be killed. Defendant told Salazar that the NF was not to hunt down Rosas to kill him, but that if an NF member should run across him, Rosas should be killed.

On the night of Rosas's murder, Chavez received a telephone call from Albert Reveles and Tim Hernandez. Hernandez told Chavez that he was at a home where Rosas was "running his mouth" about Chavez, saying that Chavez was to be "hit" by the NF. Hernandez asked Chavez what should be done to Rosas, saying he wanted to kill Rosas. Chavez told Hernandez he did not have the authority to authorize the murder of Rosas because defendant was in charge.

Chavez contacted Salazar, who set up a three-way telephone conference with defendant. In that telephone conference, defendant approved the murder of Rosas, saying: "Do what you got to do." Defendant also told Chavez that he (Chavez) had the authority to call the hit.

Hours later, Hernandez called Chavez to report that Rosas had been killed.

Subsequently, defendant told Shelton at San Quentin that Rosas was behind "some drug deal that some drugs were involved and [Rosas] supposedly had snitched on [Pena] who's also an N.F. member." Defendant admitted to Shelton that he [defendant] had called the Rosas "hit."

### D-11. *Order to Kill Esparza*

Esparza was on the NF "hit" list that Chavez and Pena had compiled in 1990. Salazar testified that defendant had ordered him to kill Esparza. Defendant told Salazar that Esparza was in trouble because Esparza was claiming that he was a member of the NS, and he was not. Salazar did not carry out defendant's order because he believed that defendant had a "personal thing" on Esparza concerning defendant's girlfriend.

### D-12. *Plot to Kill Chavez*

Shelton testified that after conferring with Lopez, he (Shelton) decided that Chavez should be killed. Lopez had written Shelton that Chavez's "status was on freeze until he (Chavez) [brought] a body to [the organization]," meaning until he "killed somebody" and he proved himself. In August 1991, Shelton began plotting Chavez's murder.

In September 1991, while Shelton and defendant were in prison, Shelton asked defendant why Chavez was not dead yet. Defendant told Shelton that he wanted to kill Chavez himself because he (defendant) had not yet committed a murder for the NF.

Chavez testified that "Smiley Joe" Ramirez had told him that the NF wanted to kill him (Chavez).

### D-13. *Murder of Esteban Guzman*

Salazar testified that in July 1991, Serna called to say that he was bringing drugs for Salazar to sell. When Serna arrived, he told Salazar that the drugs belonged to a "border brother" (i.e., Mexican) whom he robbed. Serna said he shot the drug owner with a shotgun and left no witnesses. The victim turned out to be Esteban Guzman.

Anthony Guzman testified that after the murder of Esteban Guzman, Serna told him that he (Serna) killed Esteban because Esteban was a member of a rival gang. Esteban had died from a shotgun wound to his chest.

### D-14. *Murder of Baca*

Salazar testified that Serna had told him that he (Serna) had killed Marcos "Puppet" Baca with a .22-caliber revolver because Baca was a police informant.

Anthony Guzman also testified that Serna had admitted to him that he and two others had killed Baca with a .22-caliber revolver because Baca "was no

good [and] that he was giving up people in the county jail." Guzman, who was superior to Serna in the NF, told Serna not to kill anymore because he (Guzman) did not want to be responsible.

### D-15. *Murder of Apodaca*

Sheila Apodaca was, at one time, Lopez's girlfriend. On December 30, 1990, Shelton met Apodaca. The next day, Apodaca gave Shelton a ride. During the ride, Apodaca brought up the subject of Herrera's murder. Apodaca said that she believed Shelton and the others were crazy. Shelton told Lopez about his (Shelton's) conversation with Apodaca. Lopez told Shelton not to worry because Apodaca did not know what was going on.

When Lopez was in prison, he wrote Shelton saying that he thought Apodaca might tell the police what she knew about the Herrera and Valles murders, and that Apodaca should be killed.

On August 26, 1991, at an NF meeting at Guzman's apartment, Apodaca's murder was discussed. Shelton explained that he, Serna, and Salazar all wanted to kill Apodaca. The next day, Shelton and Guzman were arrested. From the county jail, Shelton sent Lopez a message saying that the Perez and Apodaca murders were still on.

Salazar testified that Apodaca was to be killed because Lopez had learned that Apodaca was going to tell the police about Lopez's involvement in the Herrera murder. Lopez called Apodaca a "snitch bitch."

Subsequently, Salazar arranged a meeting with Apodaca at Mt. Pleasant High School. Salazar then told Serna and Trujeque to proceed to the meeting place.

Salazar observed Serna handling a .357-caliber revolver to make sure that there were no fingerprints on the bullets. When Serna and Trujeque went to the appointed place, Salazar stayed behind, nervous from knowing that he had set up Apodaca to be murdered. When Serna and Trujeque returned, Serna told Salazar that he (Serna) had shot Apodaca twice in the head.

### D-16. *Murder of Perez*

Lopez told Shelton that Ray "Chocolate" Perez was giving him a hard time, was being irresponsible, and was losing drugs. Lopez said that Perez, who was not an NF member, was disrespecting him. Lopez wanted to kill Perez, but Shelton asked Lopez to wait. When Lopez was in prison, Lopez

wrote Shelton saying that Perez should be killed because Perez was talking to law enforcement. Perez's murder was discussed at the same NF meeting in which Apodaca's murder was discussed.

On August 29, 1991, Salazar met with Trujeque and Mendoza. Salazar volunteered to lure Perez to a meeting, and accompanied Trujeque and Mendoza to that meeting. When they arrived at the meeting place, Perez came up to the window of their car and spoke with them. When Perez got in the car, the foursome drove off. When the car stopped, Salazar and Mendoza shot Perez. Salazar explained this was his first murder and he committed it for the gang.

### D-17. *Second Attempt to Murder Jasso*

Salazar testified that Shelton and Lopez authorized the murder of Jasso because Jasso was "disrespecting the NF." Jasso was a close friend of Herrera and was "kind of pissed off because the NF killed [Herrera]."

In late August and early September 1991, Santos "Bad Boy" Burnias, an NF member, called Salazar, who was in Utah, and told him to return to San Jose because the NF had to "take care" of Jasso. When Salazar returned, he, Burnias, and Joey Gonzalez went to JP's Bar in Gonzalez's jeep. When they saw Jasso, Burnias got out of the jeep, saying he would be back. Within five minutes, Burnias was back. Burnias told Salazar and Gonzalez that he had just shot Jasso three times.

Burnias later admitted to Shelton that he had shot Jasso, saying he was "just taking care of business."

Jasso survived the assassination attempt. He was treated for gunshot wounds to his shoulder and head.

### CONTENTIONS

Defendant contends:

1. The prosecution waived any claim that defendant had violated his plea agreement when it failed to bring its motion to vacate the plea agreement until 16 months after it had been entered into, and almost six months after defendant's second statement to the prosecution which was the supposed trigger for the motion; and the trial court therefore erred and deprived defendant of his state and federal constitutional rights to due process by granting the prosecution's untimely motion to vacate the plea agreement.

2. Defendant's sentence of 60 years to life violates the federal constitutional protection against cruel and unusual punishment given the improper vacating of his plea agreement under which he would have served only five years.

3. Trial counsel deprived defendant of his Sixth Amendment right to effective assistance of counsel during the proceedings on the motion to vacate his plea agreement by failing to fully investigate the likelihood of defendant passing a polygraph examination prior to stipulating to the admission of the results of a polygraph examination.

4. The trial court violated defendant's Sixth and Fourteenth Amendment rights by precluding defendant from cross-examining two prosecution witnesses and conducting direct examination of one potential defense witness regarding the killing of Farfan, which would have elicited evidence that the prosecution pursued a flawed policy of presenting unreliable accomplice witnesses against defendant and that a critical witness against defendant was unworthy of belief.

5. The trial court violated defendant's Sixth and Fourteenth Amendment rights to confrontation and due process by unduly restricting the scope of cross-examination of Kracht regarding the disposition of a case against Pena, which would have shown that defendant had no motive to agree to kill Rosas and thus prejudiced his defense against the charges of murder and conspiracy to commit murder.

6. The trial court violated defendant's state and federal constitutional rights to due process and an impartial jury trial by refusing to instruct the jury on the lesser included offense of second degree murder with respect to the conspiracy to commit murder in count 1 and the murder of Rosas in count 12.

7. The trial court deprived defendant of his state and federal constitutional rights to a trial by jury and due process by failing to instruct the jury to determine the essential factual question whether one or multiple conspiracies existed.

8. Defendant was deprived of his Sixth and Fourteenth Amendment rights to a jury trial and due process by the trial court's refusal to instruct the jury to unanimously agree on the facts underlying the elements of the conspiracy, an error which is reversible because it is impossible to determine whether the jury unanimously agreed as to whom defendant conspired to murder.

9. Defendant was deprived of his Sixth and Fourteenth Amendment rights to due process and notice of the allegations that he conspired to murder or assault both Urango and Esparza, where he did not learn of these allegations until four months into trial.

10. Defendant's conviction for conspiracy to commit murder violates state and federal due process guarantees because a conviction for conspiracy to kill one of various persons without agreement upon who was to be killed is unconstitutionally vague and generic.

11. Defendant's conviction for conspiracy to commit murder must be reversed for constitutionally insufficient evidence because this court cannot determine whether or not the jury found him guilty of conspiring to kill a person for whom there is constitutionally insufficient evidence in support of conviction.

12. The trial court violated defendant's state and federal constitutional rights to due process and a fair trial by jury by refusing to give a legally correct defense-requested jury instruction which was supported by the evidence and which pinpointed the defense theory of the case.

13. The prosecutor committed prejudicial misconduct and deprived defendant of his state and federal constitutional rights to due process and a fair trial by making an inflammatory comment and an ungrounded attack on defense counsel in closing argument.

14. Defendant was improperly sentenced to consecutive terms of 25 years to life for both the Rosas murder and the conspiracy to commit murder, in violation of section 654.

## DISCUSSION

### *Vacation of Plea Agreement*

■■■ Defendant contends the prosecution waived any claim that defendant had violated his plea agreement when it failed to bring its motion to vacate the plea agreement until 16 months after it had been entered into, and almost six months after defendant's second statement to the prosecution, which was the supposed trigger for the motion; and the trial court therefore erred and deprived defendant of his state and federal constitutional rights to due process by granting the prosecution's untimely motion to vacate the plea agreement. We disagree.

On March 23, 1993, defendant entered into a plea agreement with the prosecution, which provided in pertinent part: "(1) [Defendant] will enter a

plea of guilty to count 22 of the indictment in this case (gang-participation, a violation of Penal Code section 186.22 [subdivisions] (a) [and] (c)) and will admit allegations (to be added to the indictment) of having served two separate prior prison terms within the meaning of Penal Code section 667.5 [subdivision] (b). [¶] If, at the time of sentencing, [defendant] has fully complied with the terms and conditions of this agreement, the People will move to dismiss the conspiracy charge (Count 1) and the murder charge (Count 12), and [defendant] will be sentenced to the aggravated term of three years on Count 22 (gang-participation) plus one year for each prior prison term, for a total of five years; [¶] . . . [¶] (4) Sentencing shall not occur until after the completion of any trial or trials for any of [defendant's] co-defendants in this case. [¶] . . . [¶] (6) [Defendant] shall truthfully disclose all information with respect to the activities of himself and others concerning all matters about which agents or representatives of The People inquire of him. [¶] (7) [Defendant] shall cooperate fully with law enforcement authorities in their investigation and prosecution of this case . . . . [¶] (8) [Defendant] shall truthfully testify at any trial or retrial or other court proceeding with respect to any matter related to this case about which The People may request his testimony or pursuant to order of the court. [¶] (9) [Defendant] must at all times give complete and truthful information; should [defendant] give false, incomplete or misleading information or testimony, or otherwise violate any provision of this agreement, this agreement shall be null and void and [defendant] shall thereafter be subject to prosecution for any criminal violation of which The People have knowledge including perjury. Any such prosecution may be premised upon any information provided by [defendant] and such information may be used against him; such a prosecution may not proceed, however, unless the Court, after an independent review of the relevant facts, finds that there has been a material violation of this agreement by [defendant]."

On July 13, 1994, the prosecution moved to vacate defendant's guilty plea and the plea agreement on the ground that defendant had violated the terms of the plea agreement "by providing to the prosecution material information, which is untrue." Defendant opposed the motion, arguing laches and specific performance by defendant.

On December 21, 1994, the court, following a hearing, granted the People's motion on the basis of its finding that defendant had willfully violated the terms of the plea agreement. The court stated: "And I will rule as follows: In evaluating the evidence in this case if the only evidence that was before the court was the two statements made by the defendant I would certainly come to the conclusion that the statements were inconsistent. But based upon that evidence alone I don't believe I could conclude and I

wouldn't have concluded that there was a willful attempt on the part of the defendant to violate the witness agreement that he entered into. [¶] But in addition to that evidence that was presented during the course of the hearing we had the testimony of agent Hilley who testified that the defendant, in effect, failed the polygraph examination as it related to two crucial questions. And yes, I did follow his testimony as to how he arrived at the conclusion that if one is deceptive as to one question then the conclusion is that he would be deceptive as to all of the questions, and I did understand his testimony in that regard. But, nevertheless, his testimony was the defendant was deceptive as it related to questions posed to him about material matters. [¶] Additionally, there was the testimony of the defendant which the court considered—could consider as well and I did. My evaluation of the defendant's testimony was that he was not credible in many respects. He almost conceded withholding certain things, not quite, but almost. And I was left with the impression that he was less than candid on the witness stand because of some threat that had been made to him or probably more likely members of his family that he was unwilling fully to go into. And that was my impression as to what may well be the reason for the defendant's inconsistent statements made to the prosecution during the course of [the] two occasions when he was questioned. [¶] Therefore, my conclusion is that there was a willful violation of the witness agreement in this case and that that willful violation amounts to material evidence that relates to this particular case. [¶] Specifically, I find that he willfully violated paragraph 6 of the witness agreement which required him [to] truthfully disclose all information with respect to the activities of himself and others concerning all matters about which agents or representatives of the People inquire of him. [¶] I also find that he willfully violated paragraph 9 which required him to at all times give complete and truthful information. [¶] Therefore, the witness agreement and the disposition entered into by the defendant is now set aside. The original charges are reinstated."

The power of the court to set aside a plea bargain on the ground of breach by a defendant of its terms is beyond question. " ' "A plea agreement is, in essence, a contract between the defendant and the prosecutor to which the court consents to be bound." ' " (*People v. Armendariz* (1993) 16 Cal.App.4th 906, 911 [20 Cal.Rptr.2d 311].) "When a guilty plea is entered in exchange for specified benefits such as the dismissal of other counts or an agreed maximum punishment, both parties, including the state, must abide by the terms of the agreement." (*People v. Walker* (1991) 54 Cal.3d 1013, 1024 [1 Cal.Rptr.2d 902, 819 P.2d 861].)

As stated in *People v. Collins* (1996) 45 Cal.App.4th 849, 863-864 [53 Cal.Rptr.2d 367]: "The reciprocal nature of a plea bargain agreement mandates that either party to the agreement be entitled to enforce the agreement

in a situation where the party is deprived of the benefit of the bargain. [Citations.] . . . Failure to hold a defendant to the terms of his bargain would undermine the integrity of the judicial process. In this case, defendant's breach of his bargain included testifying falsely, conduct which is manifestly corrosive of our system of justice. There is no question that courts have inherent authority to protect the integrity of the judicial process. [Citation.]"

■ We note that here the trial court, in granting the prosecution's motion, did not address defendant's laches argument. Yet, defendant did nothing to secure a ruling on that specific issue. Defendant's failure precludes him from raising the issue on appeal. "Because defendant failed to obtain a pretrial ruling on the issue and did not pursue his objection at trial, we will not address his contention, for it is procedurally barred. [Citation.]" (*People v. Roberts* (1992) 2 Cal.4th 271, 297 [6 Cal.Rptr.2d 276, 826 P.2d 274].)

In any event, defendant's laches and waiver argument is without merit. The record discloses that defendant made two statements following the plea agreement. The first statement was made on the same date as the plea agreement, March 23, 1993. The second statement was made 10 months later on January 26, 1994. The prosecution's motion to vacate defendant's plea agreement was filed on July 13, 1994, six months after the second statement. Defendant complains that the six-month delay in the filing of the prosecution's motion to vacate the plea agreement was "in effect a ratification and acceptance of [defendant's] statements," and was "tantamount to waiver." We do not think so.

■ First, "[t]he prosecution of criminal offenses on behalf of the People is the sole responsibility of the public prosecutor. [Citations.] [¶] The prosecutor ordinarily has sole discretion to determine whom to charge, what charges to file and pursue, and what punishment to seek. [Citation.] . . . An individual exercise of prosecutorial discretion is presumed to be ' "legitimately founded on the complex considerations necessary for the effective and efficient administration of law enforcement. . . ." ' [Citations.] [¶] Exclusive prosecutorial discretion must also extend to the *conduct* of a criminal action once commenced. 'In conducting a trial a prosecutor is bound only by the general rules of law and professional ethics that bind all counsel.' [Citation.] The prosecutor has the responsibility to decide in the public interest whether to seek, oppose, accept, or challenge judicial actions and rulings. These decisions . . . involve 'the complex considerations necessary for the effective and efficient administration of law enforcement.' " (*Dix v. Superior Court* (1991) 53 Cal.3d 442, 451-452 [279 Cal.Rptr. 834, 807 P.2d 1063], original italics.)

Here, moving to vacate defendant's guilty plea on the basis of defendant's breach of the terms of the plea agreement was effectively exercising prosecutorial discretion to charge and prosecute defendant, and to conduct that prosecution in the manner deemed best " 'for the effective and efficient administration of law enforcement.' " (*Dix v. Superior Court, supra,* 53 Cal.3d at p. 452.) Given the complexity of this case, six months was not an unreasonable time for the prosecution to decide to hold defendant to his bargain and require defendant to suffer the consequences of his breach of its terms.

Second, the plea agreement implicitly authorized the prosecution to move to vacate defendant's plea for breach by defendant of its terms at any time prior to the conclusion of the trial. This implicit authority is clear from the language of the plea agreement, which inter alia provided that "[s]entencing shall not occur until after the completion of any trial or trials"; defendant "shall truthfully disclose all information with respect to the activities of himself and others concerning all matters about which agents or representatives of The People inquire of him"; defendant "shall cooperate fully with law enforcement authorities in their investigation and prosecution of this case"; defendant "shall truthfully testify at any trial or retrial or other court proceeding with respect to any matter related to this case about which The People may request his testimony"; and defendant "must at all times give complete and truthful information."

Defendant's obligation under the agreement to tell the truth and to cooperate fully with the prosecution was clearly continuing. That obligation was to last throughout the entire course of the trial. Consequently, the prosecution was not required to act immediately, and piecemeal, to void the plea agreement upon any particular breach. The prosecution had discretion under the agreement to look at how a particular breach might affect the entirety of its trial strategy, and to act only when it was convinced that voiding the plea agreement did not jeopardize its ability to prove its case. The prosecution could choose to act at any time within the time frame of the agreement, which was, at the very least, the full course of the trial.

In any event, the six-month delay, if a delay it was, did not prejudice defendant. Defendant's trial did not start for over two years after his plea agreement had been set aside. Defendant had, therefore, sufficient time to prepare for his defense.

Defendant's citation to *People v. Miller* (1992) 6 Cal.App.4th 873 [8 Cal.Rptr.2d 193] and *In re Ronald E.* (1977) 19 Cal.3d 315 [137 Cal.Rptr. 781, 562 P.2d 684], is misplaced. Neither case involved vacating a plea agreement for violation by the defendant of its terms.

We conclude the prosecution's motion to vacate defendant's plea agreement was not barred by laches or waiver, and that the trial court did not err in vacating defendant's plea agreement.

### Cruel and Unusual Punishment

██ Defendant contends his sentence of 60 years to life violates the federal constitutional protection against cruel and unusual punishment given the improper vacating of his plea agreement under which he would have served only five years. The contention is without merit.

Defendant concedes that "a sentence of 60 years to life for murder and conspiracy is not per se cruel and unusual." Defendant argues merely that because the vacation of his plea agreement was invalid, he should have been entitled to receive the benefit of his bargain, which was a sentence of five years, and, therefore, the 60-years-to-life sentence imposed on him was cruel and unusual.

Because we have determined that the trial court committed no error in setting aside defendant's plea bargain, defendant's cruel and unusual challenge also fails.

### Ineffective Assistance of Counsel

██ Defendant contends trial counsel deprived him of his Sixth Amendment right to effective assistance of counsel during the proceedings on the motion to vacate his plea agreement by failing to fully investigate the likelihood of his passing a polygraph examination prior to stipulating to the admission of the results of a polygraph examination. We disagree.

██ It has repeatedly been held that " '[a] convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.' [Citations.] 'First, the defendant must show that counsel's performance was deficient.' [Citations.] Specifically, he must establish that 'counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms.' [Citations.]" (*People v. Ledesma* (1987) 43 Cal.3d 171, 216 [233 Cal.Rptr. 404, 729 P.2d 839].) "In addition to showing that counsel's performance was deficient, a criminal defendant must also establish prejudice before he can obtain relief on an ineffective-assistance claim." (*Id.* at p. 217.) "Errorless counsel is not required . . . ." (*People v. Williams* (1988) 44 Cal.3d 883, 937 [245 Cal.Rptr. 336, 751 P.2d 395].)

Moreover, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a

result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result." (*Strickland v. Washington* (1984) 466 U.S. 668, 697 [104 S.Ct. 2052, 2069, 80 L.Ed.2d 674].)

 Here, after the prosecution had filed its motion to set aside the plea agreement, defendant's counsel and the prosecutor stipulated that defendant would submit himself to a polygraph examination by an expert acceptable to both parties, and that the results of the test would be submitted to the court to aid it in its determination of whether defendant had committed a material breach of the plea agreement. The defense and the prosecution then mutually agreed on FBI special agent Ron Hilley to conduct the polygraph test on defendant. Hilley concluded that defendant was deceptive in his answers to the four relevant questions that were related to a particular inconsistency in defendant's statements.

In its order setting aside defendant's plea agreement, the court stated that it relied in part on Hilley's testimony.

In arguing ineffective assistance, defendant asserts that "reasonably competent counsel would not stipulate to the admission of polygraph results without first conducting some investigation to ensure that the stipulated evidence would be <u>favorable</u> to [defendant]." (Original underscore.) Defendant points to no place in the record, however, which would indicate that trial counsel had agreed to the stipulation relating to defendant's polygraph examination without first reasonably informing himself of the probable outcome of such an examination. Defendant bears the burden of showing to this court that trial counsel's agreement to the polygraph examination stipulation was not an informed decision. As stated in *People v. Mitcham* (1992) 1 Cal.4th 1027, 1058 [5 Cal.Rptr.2d 230, 824 P.2d 1277]: "When a defendant on appeal makes a claim that his counsel was ineffective, the appellate court must consider whether the record contains any explanation for the challenged aspects of the representation provided by counsel. 'If the record sheds no light on why counsel acted or failed to act in the manner challenged, "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," [citation], the contention must be rejected.' [Citations.]"

 On this record, defendant has not carried his burden of showing that trial counsel's decision was not informed. Presuming an informed decision

by trial counsel, we must further presume that trial counsel's decision was a tactical choice which we cannot, for such lack of showing, review in this appeal.

### Noncharged Homicide of Farfan

▮ Defendant contends the trial court violated his Sixth and Fourteenth Amendment rights by precluding him from cross-examining two prosecution witnesses and conducting direct examination of one potential defense witness regarding the killing of Farfan, which would have elicited evidence that the prosecution pursued a flawed policy of presenting unreliable accomplice witnesses against defendant and that a critical witness against defendant was unworthy of belief. The contention is without merit.

Salazar, Arroyo, and Mendoza, who were indicted with defendant and other codefendants, entered guilty pleas. The prosecution thereafter called Salazar and Mendoza to the witness stand, but did not call Arroyo.

Defendant joined a defense motion to allow the defense to cross-examine Salazar regarding the Farfan murder. In particular, the defense wanted to show to the jury that Salazar had made the statement that Arroyo had authorized Farfan's murder, and that Arroyo had denied authorizing Farfan's murder. The attorney representing codefendant Trujeque told the court at a bench conference that "[o]ne of the two of them is lying. And, therefore, there is a problem with the deals that they've cut with the prosecution." The prosecution objected that the proffered evidence constituted impeachment on a collateral matter. The court told the defense that if it decided to bring up the Farfan murder, which happened after the indictment in this case, it did so at its own risk if the evidence turned out to be inadmissible because it would require an admissibility hearing.

On February 7, 1997, prior to Salazar's testimony, the court took up the Farfan issue again. The prosecution argued that evidence relating to the Farfan murder would be admissible only if Arroyo testified, since evidence of Salazar's participation in that murder would then be admissible as a prior bad act for impeachment; moreover, if Salazar's testimony was the result of a plea bargain in which the murder of the Farfan case was dismissed, "then that could be presented also as an issue, although I would say parenthetically that his testimony [was] not predicated on the dismissal of the Farfan case."

The defense agreed with the prosecution that evidence of the Farfan homicide was admissible only if Arroyo testified. However, counsel for codefendant Trujeque expressed his intention to attack Salazar's credibility

with the Farfan homicide because Salazar's and Arroyo's statements respecting that homicide contradicted each other. The court asked Trujeque's attorney if he intended to call Arroyo as a witness if the prosecution did not call Arroyo. Trujeque's attorney responded he would do so if Salazar testified that Arroyo had authorized Farfan's murder. The prosecution stated that it had been informed by Arroyo's attorney that if the defense attempted to call Arroyo as a witness, Arroyo would assert his right against self-incrimination, adding that if Arroyo testified the prosecution would not grant Arroyo immunity. The court stated it was disposed to allow the defense to ask Salazar questions relating to the Farfan murder.

On March 17, 1997, just prior to the commencement of Salazar's cross-examination, the defense brought up again the issue of whether it could ask Salazar questions on the Farfan homicide and asked the court for a hearing on the issue. The prosecution restated its intention not to call Arroyo as a witness, and further told the court that Arroyo's attorney had informed her that Arroyo "will take the Fifth and will not testify if called as a witness by the defense."

The court did not rule on the issue, stating instead that it "would like to see how the situation develops," and inquiring of the defense what it intended to ask Salazar. Trujeque's attorney responded that he would ask Salazar if he (Salazar) had ordered Farfan's murder. If Salazar answered he did not, he (Trujeque's attorney) would then ask Salazar if Arroyo did. The court stated: "Well, let me indicate this, Mr. Salazar has made it clear in no uncertain terms he's testifying truthfully and turned his life around. If you want to impeach his claim of truthfulness by asking him whether he was involved in the Farfan murder, you can. If you, and, I take it, if you do, that's a prerequisite to impeaching him, assuming that he says he was not. [¶] As far as going any further with this witness as to who ordered it and that sort of thing, that's premature. That sounds like you're attempting to set up impeachment of Arroyo. He has not testified yet. We don't know if he's going to testify. Should he testify, we can revisit the issue."

On March 18, 1997, during Salazar's cross-examination, the defense explained its theory of admissibility, which was that the Farfan homicide was an impeachable offense as to Salazar, and would further show that Salazar had a reason not to be truthful about his role in that homicide because his plea agreement was conditioned upon his noninvolvement in it. The court replied that if it let in any mention of the Farfan homicide, it would let in all facts surrounding that homicide.

Defendant joined the motion to allow Salazar to be examined about the Farfan homicide.

The court denied the defense request, stating: "[M]y ruling at this point subject to counsel persuading me differently is that that subject is not to be covered in cross-examination. I will sustain the [Evidence Code section] 352 objection. In so doing I'm considering the amount of time that we would have to devote to the Farfan matter. But more than that, I'm also considering everything I've heard in cross-examination so far, and I used the term ammunition, it's not a legal term. There's been a wealth of evidence that has been used so far to attack the credibility of this witness, and what has occurred so far during cross-examination. And it seems to me the Farfan matter isn't something crucial. So I find the relevancy to be substantially outweighed by undue consumption of time and confusing the issues."

On March 19, 1997, the court allowed the parties to discuss the Farfan homicide issue further. The defense made an offer of proof that included the following: (1) Salazar's ex-wife became romantically involved with Farfan in the late summer of 1992, and the two lived openly together in January 1993; (2) Salazar knew that his ex-wife was living with Farfan; (3) Salazar stated in his June 23 statement to the police that while he was in a holding cell in early 1993, he heard Arroyo say that a "green light" should be placed on Farfan because Farfan had cheated the NF out of its money; (4) in September 1993, Farfan told parole agent E. J. Allen that his (Farfan's) life was in danger because he was dating Jessica Salazar and another woman; (5) Farfan was murdered on September 27, 1993; (6) Salazar met Louis Oliverez in 1989; (7) on October 7, 1993, Nancy Hermocillo told the police that on September 23, 1993, which was four days prior to Farfan's murder, she was at a friend's house and overheard a telephone conversation between Salazar and Oliverez wherein Salazar had asked Oliverez to kill Farfan; and (8) Salazar's plea agreement was conditioned upon Salazar's noninvolvement in the Farfan murder.

On March 26, 1997, the court once more denied the defense motion, reasoning that the prosecution did not intend to call Arroyo as a witness. The court admitted that the proffered evidence was relevant, but found it inadmissible under Evidence Code section 352 because admission of the evidence would confuse the jury and consume an undue amount of time. The court explained: "The issue of the admissibility of testimony concerning Paul Farfan, as I recall, arose in the context of a discussion at the bench where it was anticipated that Mr. Salazar and Mr. Arroyo would both testify. And the offer of proof was that their testimony would conflict as it relates to the subject of the green light on Paul Farfan, thus establishing that someone's not telling the truth, whether it's Mr. Salazar or whether it is Mr. Arroyo. And at that time, as I recall, I indicated preliminarily that I would allow some questioning in that area. [¶] Now, since that discussion, my

understanding at this point is that Mr. Arroyo is not going to be testifying as a witness. That may change. If he does testify as a witness, this issue undoubtedly will be revisited, because I invite Mr. Mayfield [counsel for Trujeque] to revisit the issue. But the issue is not squarely before the court now. [¶] . . . [¶] The issue as I indicated is a [Evidence Code section] 352 issue. It is not a relevancy issue because obviously this testimony satisfies in my opinion the defense of relevant evidence in California. But being a [Evidence Code section] 352 issue, the court has to look at the probative value and weigh it against the possibility of confusing the issues, principally confusing the jury as well as the undue consumption of time. [¶] Now, the justification for offering this testimony in a very general sense is two-fold. One, it's the credibility of Jerry Salazar. And then, No. 2, something that I have quite—I have not completely understood, that is, Mr. Selvin [counsel for codefendant Herminio Serna], the argument about the theory—the theory of the conspiracy, its admissibility under the theory of the conspiracy. [¶] . . . [¶] Credibility is a very broad term. Whether they're talking about credibility in a general sense that Jerry Salazar is a liar or in a more specific sense that he's a liar in this particular case, has lied, and even more particularly has violated the plea agreement by not telling the truth. We're still talking about credibility. [¶] . . . [¶] [S]o far as it relates to Mr. Salazar, he has been impeached about prior inconsistent statements in a number of instances by defense counsel. Additionally, he's admitted lying in the past, and not just as it relates to the June '93 interview, but he has been compelled or persuaded to admit that he lied in other instances on the witness stand. [¶] Defense counsel certainly can argue the significance of his inconsistent statements, certainly can be argued that he has lied and is in fact an admitted liar. [¶] But not only that, as it relates to the use of the Farfan murder as an example of an act of moral turpitude which bears on his credibility, Mr. Salazar has been confronted with a number of instances that counsel can use to argue the point of credibility. [¶] There's the bowling alley set up that Mr. Salazar was involved [in] whereby an individual from Fresno was robbed and pistol whipped. [¶] There's the incident at J.P.'s involving two Chinese males that Mr. Salazar was involved with whereby he . . . sucker punched one of the individuals after apologizing to him, suggesting that he is a man of bad character not simply because he's violent, but there's also the suggestion he's homophobic. [¶] There's an incident described in the testimony at a disco where Mr. Salazar was there with Mr. Lopez and Mr. Shelton. [¶] There's the incident involving Roland Saldivar's uncle where Salazar admitted on the stand that he pointed a gun at the individual. [¶] There's the issue involving Mr. Urango where Mr. Salazar admitted to looking for him to kill him. [¶] There's the incident at King and Story Road where Mr. Salazar was the driver and a passenger shot, apparently wounding several Surenos. [¶] There's the incident involving . . . Alex Flemate, where

Mr. Salazar was involved in a plot to kill him. [¶] There's the issue involving Spookio. And one of the interpretations of the evidence that I would assume the defense would find favorable was their suggestion that Mr. Salazar was involved in a plot to kill Spookio motivated by jealousy. [¶] There's the Beto Jasso incident, attempted killing of Carlos Mejias, that Mr. Salazar was involved in. [¶] We heard about a New Years incident I believe in Watsonville where Mr. Salazar had a stabbing instrument and apparently stabbed the wrong person by accident. [¶] We've heard that he planned the murder of one of the defendants in this case, Eddie Vargas. [¶] There's even been a suggestion that when he was thrown in the hole when he was in prison just before his release that he was involved in some inappropriate activity. [¶] And then I also made note of his involvement in a robbery of a drug dealer in the City of Fresno. And there are others. [¶] The point I'm making is there's ample evidence to attack the credibility of Mr. Salazar based not only on his inconsistent statements of his admissions of being untruthful, but based on a number of specific instances. This is significant because in my opinion it lessens the probative value of the Paul Farfan incident. [¶] So what I find is the probative value, although there is some probative value, is not particularly extensive for all the reasons that I listed, and in particular the specific instances which counsel has inquired into already. [¶] What I do find is to allow the inquiry into the Paul Farfan incident as described in the offer of proof will cause undue consumption of time and can lead to the confusing of the jury in this case because one possible situation is a mini-trial where the death of Paul Farfan will be litigated. Certainly the People are allowed to litigate that issue if I allow the defense to do so. [¶] In short, I find that the probative value is outweighed by the factors I cited. The court's ruling is the testimony is not admissible. [¶] I want to remind in particular Mr. Mayfield, if we have a situation arise similar to what we envisioned in the past, we, being all of us, involving Mr. Arroyo testifying, then the court is happy to revisit the issue."

On April 16, 1997, the defense again sought to bring out the issue of Salazar's perjury on the basis of the conflict between Salazar, who said that Arroyo had authorized Farfan's murder, and Arroyo, who denied authorizing such murder. The defense wanted to question Mendoza, who Salazar said was present when Arroyo gave the green light to murder Farfan. Trujeque's counsel argued that he should be allowed to question Mendoza whether Arroyo had given the "green light," and be allowed to call Arroyo to ask whether he authorized the murder.

The prosecution responded that if the court allowed evidence of the Farfan homicide to come in, it was going to prove that what Salazar had said was true.

The court reiterated its ruling that evidence of the Farfan homicide was inadmissible, adding: "It was mentioned this afternoon that as it relates to the issue of credibility, Mr. Mayfield indicated he wanted to establish that Salazar will lie about murders. Well, that's already been established in the testimony that he made some false accusations as it relates to who participated in what, and I know you're all familiar with that testimony. [¶] The right to confront and cross-examine is not without limitation as we all know. And I feel that as it relates to Mr. Salazar, he has been confronted and cross-examined, not only at length, but with reference to a number of subjects where counsel would be able to argue forcefully that the man is a liar when this case is argued."

On August 15, 1997, the court denied defendant's motion for a new trial which defendant based, inter alia, on the ground of error in precluding evidence relating to the Farfan incident.

■ The standard of review for Evidence Code section 352 challenges is abuse of discretion. "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

On appeal, " '[a] trial court's exercise of discretion will not be disturbed unless it appears that the resulting injury is sufficiently grave to manifest a miscarriage of justice. [Citation.] In other words, discretion is abused only if the court exceeds the bounds of reason, all of the circumstances being considered. [Citation.]' " (*People v. Green* (1995) 34 Cal.App.4th 165, 182-183 [40 Cal.Rptr.2d 239].)

■ The underlying assumption in defendant's challenge is that the proffered evidence relating to the Farfan incident would have shown that either Salazar or Arroyo was lying. The assumption is flawed. The prosecution repeatedly told the parties and the court that it was not going to call Arroyo as a witness, and, in fact did not call Arroyo. Because Arroyo did not testify, his version of the story was not before the jury. Consequently, the jury did not know that Arroyo's version was in conflict with Salazar's version. It follows that while Arroyo's version was relevant as tending to discredit Salazar, the court could reasonably conclude it was not probative enough to outweigh its potential for prejudice in terms of time consumption and issue confusion. The prosecution had indicated that if Arroyo testified, it would adduce evidence to prove that Salazar was telling the truth. The court, for its part, stated that if it allowed the defense to bring out evidence relating

to the Farfan incident, it would also have to allow the prosecution to litigate the issue. The result would be a mini trial on a crime with which defendant was not charged, resulting in jury confusion and inordinate consumption of time.

Defendant argues that the trial court's concern that allowing Salazar to be questioned on the Farfan incident would result in undue consumption of time was not well-founded because the trial was in fact finished several months earlier than estimated. The argument is not persuasive. "Undue consumption of time" refers not only to the time used to try the case, but also the time lost to the court by giving one case more time than needed, to the prejudice of other cases which could have productively used the time wasted. Here, the trial took five months of the court's time. Giving this case more time than was reasonably necessary was prejudicially taking off time from other cases that needed judicial attention just as well.

Defendant's reliance on *In re Anthony P.* (1985) 167 Cal.App.3d 502 [213 Cal.Rptr. 424], *United States v. Giovanelli* (2d Cir. 1991) 945 F.2d 479 (*Giovanelli*), *People v. Randle* (1982) 130 Cal.App.3d 286 [181 Cal.Rptr. 745] (*Randle*), and *People v. Babbitt* (1988) 45 Cal.3d 660 [248 Cal.Rptr. 69, 755 P.2d 253] (*Babbitt*), is misplaced. Those cases addressed distinguishable situations. *In re Anthony P.* involved the scope of cross-examination about a racial bias, which is not an issue here; *Giovanelli* involved a prosecution in federal court of a defendant who had been acquitted in a state trial; *Randle* did not involve an Evidence Code section 352 issue at all; and *Babbitt* did not find that undue consumption of time was an appropriate factor to consider.

We are also not persuaded by defendant's argument that "the excluded evidence would have shown that the prosecution knowingly presented false or at least misleading testimony." The prosecution was ready to prove that Salazar was telling the truth had defendant been allowed to examine Salazar about the Farfan incident.

We conclude the trial court did not abuse its discretion in disallowing evidence relating to the Farfan homicide.

### Cross-examination of John Kracht

Defendant contends the trial court violated his Sixth and Fourteenth Amendment rights to confrontation and due process by unduly restricting the scope of cross-examination of John Kracht regarding the disposition of a case against Pena, which would have shown that defendant had no motive to agree to kill Rosas and thus prejudiced his defense against the charges of murder and conspiracy to commit murder. We disagree.

Rosas was murdered on June 26, 1991, by assailants who were not identified. The prosecution's evidence showed that defendant authorized Rosas's murder because Rosas had identified Pena as the person who had earlier robbed Petra Gonzalez, who was the mother of Rosas's girlfriend. The prosecution's evidence consisted of Pena's confession, statements made by several NF members, and evidence of the actual robbery itself wherein Gonzalez identified Pena to the police as one of the robbers. Gonzalez testified that two masked men broke into her home on December 31, 1983, and that Rosas went to her defense. Gonzalez did not know who Pena was and did not recall if Pena was one of the intruders.

John Kracht, the district attorney's investigator, testified that he used to be employed by the San Jose Police Department and that, while employed as such, he had investigated the Rosas robbery and had spoken to Gonzalez. Gonzalez identified Pena's picture as that of one of the robbers. Gonzalez also told Kracht that Pena had held a knife to her neck and had cut her.

During cross-examination, the defense asked Kracht whether his reports with reference to the Rosas robbery investigation were closed; whether he ever testified at a trial involving Pena regarding the Rosas robbery; and whether he ever appeared in court "with reference to charges brought against Pablo Pena as a result of this incident." The prosecution objected to the questions on relevancy grounds. The court sustained the objections. Trujeque's counsel requested a hearing on the defense objection. The court granted the request, and a hearing was held out of the presence of the jury.

At the hearing, the defense stated, as an offer of proof, that Pena was not prosecuted for the Rosas robbery, and this lack of prosecution showed that the prosecution's theory was not viable. The defense further stated that because Pena was not prosecuted, "there never was any way that [Pena] would know that anything happened."

The court ruled that the objected questions were irrelevant, and, in any event, the relevancy of the questions was "greatly outweighed by undue consumption of time on a collateral issue, really."

We find no error. Pursuant to Evidence Code section 210, "relevant evidence" is evidence that has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." Trial courts have wide discretion in determining the relevancy of evidence. (*Babbitt, supra,* 45 Cal.3d at p. 681.)

The fact that was of consequence which the defense sought to establish with the challenged questions was the viability of the prosecution theory that

defendant authorized the murder of Rosas because Rosas had identified Pena as one of the robbers in the Rosas robbery. Defendant's argument is that such theory was not viable because Kracht's investigation of the Rosas robbery had been closed, and Kracht had not appeared in court in regard to any charges brought against Pena respecting the Rosas robbery.

We fail to see the logic of the argument. The closure of Kracht's investigation, and the fact that Kracht never appeared nor testified at a trial involving the Rosas robbery, did not mean that Rosas was without other means of knowing that Pena was involved in the Rosas robbery. Rosas's knowledge of Pena's participation could have come from sources other than Kracht's investigation or court testimony. In fact, Rosas was present when the robbery took place, and even went to the defense of Gonzalez. Pena, as one of the robbers, likely knew of Rosas's presence during the robbery and of Rosas's role in coming to the defense of Gonzalez. There is evidence that in late June 1991, defendant told Salazar that there was a "green light" on Rosas because Rosas had "snitched on Pablo Pena, Panther." Chavez testified that while he was in prison with Pena, Pena had told him that he (Pena) had robbed Rosas's home. There is also evidence that after Rosas's murder, Shelton asked defendant about it, and defendant's reply was: "Fuck that punk, I just told them [Chavez and Salazar] to deal with it, that he [Rosas] had some situation with Panther [Pena]."

Because the questions of whether Kracht had closed his investigation and whether he had appeared or testified at a trial involving the Rosas robbery did not foreclose the prosecution theory that defendant had authorized the murder of Rosas because Rosas knew that Pena was involved in the Rosas robbery, the trial court did not exceed the bounds of reason, and therefore did not exceed its discretion, in sustaining the prosecution's objections to the challenged cross-examination questions on relevancy grounds.

Moreover, the trial court stated that, in any event, the relevancy of the questions was "greatly outweighed by undue consumption of time on a collateral issue." Defendant has not seriously challenged this Evidence Code section 352 determination by the trial court, except to point out that only two questions were objected to. It is not possible to tell, however, how many more questions on the subject might have been asked, and how much more time might have been spent by both sides on the issue, had no timely objections been made to the initial questions, and had not the trial court sustained the objections.

### Lesser Included Offense Instruction

Defendant contends the trial court violated defendant's state and federal constitutional rights to due process and an impartial jury trial by

refusing to instruct the jury on the lesser included offense of second degree murder with respect to the conspiracy to commit murder in count 1 and the murder of Rosas in count 12. The contention is without merit.

As to count 1, defendant did not request below that the jury be instructed on conspiracy to commit second degree murder, but claims on appeal that the trial court had the sua sponte duty to give such instruction. The court had no such duty, and the issue is now settled. In *People v. Cortez* (1998) 18 Cal.4th 1223, 1237-1238 [77 Cal.Rptr.2d 733, 960 P.2d 537], the California Supreme Court held that "all conspiracy to commit murder is necessarily conspiracy to commit premeditated and deliberated first degree murder, and that all murder conspiracies are punishable in the same manner as murder in the first degree pursuant to the punishment provisions of Penal Code section 182. The time has come to disapprove our early decision in [*People v.*] *Horn* [(1974)] 12 Cal.3d 290 [115 Cal.Rptr. 516, 524 P.2d 1300], to the extent it is inconsistent with the views expressed herein."

As to count 12, the Rosas murder, defendant requested the trial court to instruct the jury on second degree murder. The prosecution objected, arguing that, as to that murder, defendant was either guilty of conspiracy to commit first degree murder or not guilty of any crime. The court denied defendant's request, stating: "As it relates to Mr. Vargas, . . . it's either a first degree murder or it's not a first degree murder. I expect—or based on what I've observed during the course of this trial, that the credibility of witnesses who will testify about Mr. Vargas will be attacked. The argument is going to be he didn't commit any crime. To the extent he did, the evidence suggests in my opinion that if there was a crime, it's a first degree murder. Therefore, I don't believe it's appropriate to instruct on second degree murder."

As the court expected, defendant's counsel subsequently argued to the jury that defendant was not guilty at all of the Rosas homicide.

The trial court's duty to instruct on lesser included offenses has been summarized, thus: " 'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' [Citation.] That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation] but not when there is no evidence that the offense was less than that charged. [Citations.] The obligation to instruct on lesser

included offenses exists even when as a matter of trial tactics a defendant not only fails to request the instruction but expressly objects to its being given. [Citations.] Just as the People have no legitimate interest in obtaining a conviction of a greater offense than that established by the evidence, a defendant has no right to an acquittal when that evidence is sufficient to establish a lesser included offense. [Citation.]" (*People v. Sedeno* (1974) 10 Cal.3d 703, 715-716 [112 Cal.Rptr. 1, 518 P.2d 913], fn. omitted.)

Further, " ' "[i]t has long been settled that the trial court need not, even if requested, instruct the jury on the existence and definition of a lesser and included offense if the evidence was such that the defendant, if guilty at all, was guilty of something beyond the lesser offense." [Citations.]' [Citation.]" (*People v. Guertin* (1996) 47 Cal.App.4th 505, 507 [54 Cal.Rptr.2d 821].)

 Defendant claims that he acted rashly, and therefore without deliberation or premeditation, when he approved the Rosas murder. The claim is not supported by the facts on record.

The record shows that in late June 1991, defendant told Salazar that there was a "green light" on Rosas because Rosas had "snitched on Pablo Pena, Panther." However, before the green light was executed, defendant wanted confirming "paperwork" because if Rosas was killed and defendant was wrong, defendant would himself be killed. Chavez testified that on the night Rosas was killed, he received a telephone call from Roy Reveles and Tim Hernandez asking him for authority "[t]o hit Little Eli [Rosas]." Chavez told Hernandez that he "didn't have the authority to make any decisions." Chavez then contacted Salazar, who contacted defendant. In a three-way telephone discussion with Salazar and defendant, Chavez told defendant that Reveles and Hernandez had asked for his authority to kill Rosas and that he had told them that he "couldn't make that decision." Chavez asked defendant what he was to do. Defendant told Chavez to "do what you got to do," which meant to "kill [Rosas]."

This three-way telephone conversation took place while defendant was at the home of Michelle Valderama, his sister-in-law. Valderama overheard defendant's side of the conversation, including the name "Eli," which was how Rosas was called, and defendant's instruction to the caller to "just do what you got to do," and for the caller to let him know what happened.

Subsequently, when defendant and Shelton were at San Quentin, defendant told Shelton, in referring to Rosas: "Fuck that punk, I just told them [Chavez and Salazar] to deal with it, that he [Rosas] had some situation with Panther [Pena]," and that Rosas was behind "some drug deal that some drugs

were involved and that [Rosas] had supposedly had snitched on [Pena] who's also an N.F. member."

The foregoing facts demonstrate premeditation and deliberation, not rashness. If the jury accepted the facts as true, the killing of Rosas was murder of the first degree. If the jury did not believe the foregoing evidence, particularly that relating to the three-way conversation among defendant, Chavez, and Salazar, then defendant was not guilty of any crime. There was no middle ground.

Accordingly, we conclude the trial court did not err in refusing to give the second degree murder lesser included offense instruction.

### One or Multiple Conspiracies

Defendant contends the trial court deprived defendant of his state and federal constitutional rights to a trial by jury and due process by failing to instruct the jury to determine the essential factual question whether one or multiple conspiracies existed. We disagree.

On conspiracy, the defense proposed a modified version of CALJIC No. 6.10, to read as follows: "If you find the existence of a conspiracy beyond a reasonable doubt, you must determine whether a single or multiple conspiracies have been proven. If there was one overall agreement among the various parties to perform various functions to carry out the objectives of the conspiracy, then there is but a single conspiracy. If there were separate agreements each of which had its own distinct, illegal end and which were not drawn together in a single, overall, comprehensive plan, then each such agreement is a separate conspiracy. [¶] The indictment alleges only a single count of conspiracy. If you find the existence of multiple conspiracies, a defendant may be found guilty of conspiracy if the proof shows beyond a reasonable doubt that he participated in one or more of the conspiracies. However, to find a defendant guilty of conspiracy you must unanimously agree as to which conspiracy or conspiracies he participated in. It is not necessary that the particular conspiracy or conspiracies agreed upon be stated in your verdict."

The prosecution objected to this proposed instruction, arguing that while there was one umbrella conspiracy, which was the NF, "there have to be some specific efforts on the part of each conspirator to join in that conspiracy as a—if you would like, a mini conspiracy within the ambit of the larger one. Obviously, the larger one is the [Nuestra Familia] doing evil things as a group, but we have never gone so far as to say that simply joining

the NF makes one responsible for all of the crimes then committed by the gang itself, necessarily. But in terms of the umbrella conspiracy and for [Evidence Code section] 1223 there is such an umbrella conspiracy to commit crimes, the named crimes in general. But that's why in terms of the verdict form and also the accomplice stuff and all of the rest of it, we have specific murder object, object crimes, that is, the murder of certain specific individuals. The subjects of the object crimes, if you will."

The court refused the proposed instruction, stating that it found the last two paragraphs thereof, which deal with multiple conspiracies, "potentially very confusing,"

The next day, the court announced: ". . . I've rethought my position. As you know, I've indicated before that I felt that the jury would not only have to find unanimously which of the target crimes were the subject of the conspiracy, but I went on to indicate that I felt they would have to be unanimous as to which particular event associated with the target crimes, for example, which murder. And in keeping with that position, I felt that the jury verdict forms should be specific as to possible victims, where they could not only demonstrate their unanimous opinion concerning the target crime, but which particular event. [¶] After reconsidering, I've come to the conclusion I was wrong. And it's my opinion that the jury need only be unanimous about the target crimes, that they don't have to unanimously agree as to which event, nor does that have to be reflected in the jury verdict form, whether it be which murder or which robbery or which distribution of controlled substances. [¶] I am not inclined, still, to give the instructions requested by the defense dealing with multiple conspiracies, and the record is clear as to the proposed instructions which I rejected already."

The court then gave the jury the following instruction on conspiracy (CALJIC No. 6.10): "A conspiracy is an agreement entered into between two or more persons with the specific intent to agree to commit an object crime or crimes and with the further specific intent to commit the object crime or crimes followed by an overt act committed in this state by one or more of the parties for the purpose of accomplishing the object or objects of the agreement. Conspiracy is a crime. [¶] In order to find a defendant guilty of conspiracy, in addition to proof of the unlawful agreement and specific intent, there must be proof of the commission of at least one of the acts alleged in the indictment to be an overt act and that the act committed was an overt act. It is not necessary to the guilt of any particular defendant that defendant personally committed the overt act, if he was one of the conspirators when the alleged overt act was committed. [¶] The term 'overt act' means any step taken or act committed by one or more of the conspirators

which goes beyond mere planning or agreement to commit a crime and which step or act is done in furtherance of the accomplishment of the object of the conspiracy. [¶] To be an 'overt act,' the step taken or act committed need not, in and of itself, constitute the crime or even an attempt to commit the crime which is the ultimate object of the conspiracy. Nor is it required that the step or act, in and of itself, be a criminal or an unlawful act."

The jury was also instructed pursuant to CALJIC No. 6.25: "In order to find a defendant guilty of the crime of conspiracy, you must find beyond a reasonable doubt that a defendant conspired to commit one or more of the object crimes of the conspiracy, and you also must unanimously agree as to which particular crime or crimes he conspired to commit. [¶] If you find defendant guilty of conspiracy, you will then include a finding on the question as to which alleged object crimes you unanimously agree a defendant conspired to commit. A form will be supplied for that purpose for each defendant."

In addition, because of the allegation in the indictment that the conspiracy was committed for the benefit of a criminal street gang, the court instructed the jury that "[i]f you find a defendant guilty of any crime charged, then you must decide if he committed that crime or those crimes for the benefit of, at the direction of, or in association with a criminal street gang."

Defendant argues that the question of whether one or more conspiracies existed in this case was a question of fact for the jury to determine, and, therefore, the trial court violated his state and federal constitutional rights to a trial by jury and due process when that court refused his request to instruct the jury to "determine whether a single or multiple conspiracies had been proven, and to agree unanimously as to which conspiracy or conspiracies each defendant participated in." We disagree.

In *People v. Tran* (1996) 47 Cal.App.4th 759, 772 [54 Cal.Rptr.2d 905], this court stated: " 'The crime of conspiracy is defined in the Penal Code as "two or more persons conspir[ing]" "[t]o commit any crime," together with proof of the commission of an overt act "by one or more of the parties to such an agreement" in furtherance thereof. [Citation.] "Conspiracy is a 'specific intent' crime. . . . The specific intent required divides logically into two elements: (a) the intent to agree, or conspire, and (b) the intent to commit the offense which is the object of the conspiracy. . . . To sustain a conviction for conspiracy to commit a particular offense, the prosecution must show not only that the conspirators intended to agree *but also that they intended to commit the elements of that offense*." [Citation.]' [Citation.]" (Original italics.)

In a conspiracy, "[t]he gist of the offense is the unlawful agreement between the conspirators to do an act contrary to law, accompanied by an overt act to at least start to carry the conspiracy into effect." (*People v. Moran* (1958) 166 Cal.App.2d 410, 414 [333 P.2d 243].) In *People v. Lopez* (1994) 21 Cal.App.4th 1551, 1557 [26 Cal.Rptr.2d 741], the court, quoting 1 Witkin and Epstein, California Criminal Law (2d ed. 1988) Elements of Crime, section 163, at page 181, stated that " '[o]ne agreement gives rise to only a single offense, despite any multiplicity of objects.' "

In *Braverman v. United States* (1942) 317 U.S. 49, 53-54 [63 S.Ct. 99, 101-102, 87 L.Ed. 23] (*Braverman*), where the defendants were charged with the illegal manufacture, transportation and distribution of liquor, and each count charged a conspiracy to violate a different penal statute, and where it was conceded that the different violations were all pursuant to a single overall agreement, the United States Supreme Court concluded that there was only one conspiracy, reasoning: "The gist of the crime of conspiracy as defined by the statute is the agreement or confederation of the conspirators to commit one or more unlawful acts 'where one or more of such parties do any act to effect the object of the conspiracy.' The overt act, without proof of which a charge of conspiracy cannot be submitted to the jury, may be that of only a single one of the conspirators and need not be itself a crime. [Citations.] But it is unimportant, for present purposes, whether we regard the overt act as a part of the crime which the statute defines and makes punishable, [citation], or as something apart from it, either an indispensable mode of corroborating the existence of the conspiracy or a device for affording a *locus poenitentiae*, [citations]. [¶] For when a single agreement to commit one or more substantive crimes is evidenced by an overt act, as the statute requires, the precise nature and extent of the .conspiracy must be determined by reference to the agreement which embraces and defines its objects. Whether the object of a single agreement is to commit one or many crimes, it is in either case that agreement which constitutes the conspiracy which the statute punishes. The one agreement cannot be taken to be several agreements and hence several conspiracies because it envisages the violation of several statutes rather than one. [¶] The allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for 'The conspiracy is the crime, and that is one, however diverse its objects.' [Citations.] A conspiracy is not the commission of the crime which it contemplates, and neither violates nor 'arises under' the statute whose violation is its object. [Citations.] Since the single continuing agreement, which is the conspiracy here, thus embraces its criminal objects, it differs from successive acts which violate a single penal statute and from a single act which violates two statutes. [Citations.] The single agreement is the prohibited conspiracy, and however diverse its objects it violates but a single statute . . . . For such a violation, only the single penalty prescribed by the statute can be imposed."

Here, the prosecution charged defendant with only one count of conspiracy. Assuming that more conspiracy counts could have been charged under the facts, the decision to charge defendant with only one conspiracy count was a prosecutorial charging discretion that we do not review. The exercise of that discretion involves questions of prosecutorial policies and judgment, not questions of fact for the jury to determine.

Moreover, we fail to see how charging defendant with one count of conspiracy, instead of multiple counts, could prejudice defendant. Any error would therefore be harmless.

Furthermore, assuming there were multiple conspiracies, we do not see how the existence of the uncharged conspiracies can result in the reversal of a guilty finding in the one conspiracy that was charged. If the evidence submitted to the jury supports the guilty finding on the charged conspiracy, the fact that the same evidence might also have supported other conspiracies, which were not charged, is of no consequence to the issue of innocence or guilt on the charged conspiracy.

In fact, the record evidence points only to one conspiracy—the agreement to establish the NF as a criminal gang to commit murder, robbery, burglary, extortion, and drug trafficking, among other crimes. Within that umbrella conspiracy were subconspiracies to commit specific crimes. However, the commission of the specific crimes, and the drawing up of plans required to commit them, were all in pursuance of the overriding purpose of the NF, which was to establish power through the use of crime, force, and fear, and to use that power to further strengthen and perpetuate itself by killing its enemies, raising money for the gang, and instilling obedience and discipline among its members by killing members who break its rules. Thus, Rosas was killed because he had "snitched on Pablo Pena, Panther." The decision to kill Rosas, being one in furtherance of the overriding purpose of the conspiracy, was part of the overall conspiracy, and hence cannot be the basis for filing a separate charge of conspiracy.

It has been held that the overall scheme need not be complete in all its aspects at the time it is formed. (*United States v. Becker* (5th Cir. 1978) 569 F.2d 951, 959.) "A conspiracy is not necessarily a single event which unalterably takes place at a particular point in time when the participants reach a formal agreement; it may be flexible, occurring over a period of time and changing in response to changed circumstances." (*People v. Jones* (1986) 180 Cal.App.3d 509, 517 [225 Cal.Rptr. 697].) "The general test is whether there was 'one overall agreement' to perform various functions to achieve the objectives of the conspiracy. [Citation.] Performance of

separate crimes or separate acts in furtherance of a conspiracy is not inconsistent with a 'single overall agreement.' [Citation.] The general test also comprehends the existence of subgroups or subagreements." (*United States v. Zemek* (9th Cir. 1980) 634 F.2d 1159, 1167 (*Zemek*).)

■■■■ Because the Rosas murder did not provide evidence of a conspiracy separate from the overriding NF conspiracy, it did not support defendant's request for multiple conspiracies instruction. A trial court is required to instruct the jury to determine whether a single or multiple conspiracies exist only when there is evidence to support alternative findings. (*People v. Skelton* (1980) 109 Cal.App.3d 691, 717 [167 Cal.Rptr. 636] (*Skelton*); *United States v. Heath* (10th Cir. 1978) 580 F.2d 1011, 1022.)

In *Zemek*, the Ninth Circuit Court of Appeals applied a four-factor analysis to determine whether the crimes were committed pursuant to an overall scheme. These factors are: (1) the nature of the scheme; (2) the identity of the participants; (3) the quality, frequency, and duration of each conspirator's transactions; and (4) the commonality of times and goals. (*Zemek*, *supra*, 634 F.2d at p. 1167.)

We are not pointed to any California case adopting the *Zemek* factors, nor has our own research disclosed such a case. Nonetheless, even applying the *Zemek* factors, as defendant suggests we do, we find in the record no convincing evidence to support defendant's claim of multiple conspiracies.

First, on the nature of the scheme, NF was organized primarily as a prison gang. However, it also functioned on the streets, engaging in various criminal activities. NF's basic purpose was to make money through crime for its members in and out of prison. NF members pledge allegiance to act in concert and to commit crimes, including murder, for the gang. NF has a written constitution, and its rules require the members to cover up each other's crimes. The only way to get out of the gang is to die, be killed, or be a dropout/snitch. NF's rule is "blood in, blood out," which means that one becomes a member of NF by spilling blood, preferably by killing, and leaves the gang by being killed as a coward, traitor, or deserter. A member may be killed by the gang for refusal to follow a superior's orders, or for failure to attend meetings.

On the identity of participants, members participate in whatever criminal activities their superiors order them to do. There is common overlapping of crime assignments.

On the quality of the frequency and duration of a conspirator's transactions, the members are committed to each other in a continuing relationship

forged by the bond of "blood in, blood out." NF's written constitution provides for a ranking system where those in higher ranks issue orders to those in lower ranks, and where the penalty for disobeying the orders of a superior is death.

On the commonality of time and goals, the time period for the conspiracy in this case was two and a half years. The goals of the gang, which included making money for its members in and out of prison through criminal activities, such as murder, robbery, and drug trafficking, were shared by all the members.

The four *Zemek* factors to distinguish a single conspiracy from multiple conspiracies all point to a single conspiracy in this case.

We conclude the trial court's instructions were consistent with the law on conspiracy, which is that a single agreement to commit a number of crimes is only one conspiracy, regardless of the number of crimes sought to be committed, or that are committed, under that conspiracy.

Defendant's reliance on *People v. Morocco* (1987) 191 Cal.App.3d 1449 [237 Cal.Rptr. 113] (*Morocco*), *Skelton, supra,* 109 Cal.App.3d 691, and *People v. Liu* (1996) 46 Cal.App.4th 1119 [54 Cal.Rptr.2d 578] (*Liu*), is misplaced.

In *Morocco*, the defendant was charged with, and convicted of, two counts of solicitation to commit murder. The victims were husband and wife. The court, applying principles of conspiracy law to determine whether the defendant was guilty of one or two solicitations, struck the defendant's second conviction because the evidence showed that although there were two victims, there was only one plan encompassing the killing of both victims. If anything, therefore, *Morocco* supports the single conspiracy determination in this case. (*Morocco, supra,* 191 Cal.App.3d at p. 1454.)

In *Skelton*, the court in fact reiterated the rule that "[t]he test is whether there was one overall agreement among the various parties to perform various functions in order to carry out the objectives of the conspiracy. If so, there is but a single conspiracy. [Citation.]" (*Skelton, supra,* 109 Cal.App.3d at p. 718.) *Skelton* further held that "[a] judgment will not be reversed on the ground that two separate conspiracies were charged as one, unless the appellant shows that he was prejudiced thereby. [Citations.]" (*Id.* at pp. 718-719.) We have discussed, *ante,* that defendant was not prejudiced by the finding of a single conspiracy in this case.

In *Liu*, the defendant was convicted of two counts of conspiracy to commit murder, and sought the reversal of one conviction, arguing that he should be

convicted of only one conspiracy, which is the converse of the situation here where the trial court found only one conspiracy and defendant claims there were multiple conspiracies. The *Liu* court affirmed the two convictions, but that was because it did not find an overriding conspiracy subsuming the two murders. Instead, it found that "[e]ach separately planned murder is the goal of a separate conspiracy." (*Liu, supra,* 46 Cal.App.4th at p. 1133.) *Liu* in fact recognized the rule that "the test of whether or not [the conspirators] have formed a single conspiracy is whether the acts were merely steps or stages in the formation of a larger and ultimately more general, all-inclusive conspiracy directed at achieving a single unlawful result. [Citation.] Under this rule, where the evidence shows that a group of conspirators agreed to commit a number of different crimes incidental to a single objective, there is only one conspiracy, and convictions for multiple conspiracies cannot be sustained. [Citation.]" (*Ibid.*)

We conclude the trial court did not err in failing to instruct the jury to determine whether one or multiple conspiracies existed in this case.

*Unanimity Instruction*

 Defendant contends he was deprived of his Sixth and Fourteenth Amendment rights to a jury trial and due process by the trial court's refusal to instruct the jury to unanimously agree on the facts underlying the elements of the conspiracy, an error that is reversible because it is impossible to determine whether the jury unanimously agreed as to whom defendant conspired to murder. We disagree.

There is a split of authority as to whether jury unanimity on at least one overt act is required for a conspiracy conviction. Some cases hold that the trial court need not instruct the jury that it must unanimously agree on a particular overt act charged in furtherance of the conspiracy. (See, e.g., *People v. Lopez* (1993) 20 Cal.App.4th 897, 904 [24 Cal.Rptr.2d 649]; *People v. Godinez* (1993) 17 Cal.App.4th 1363, 1367 [22 Cal.Rptr.2d 164]; *People v. Von Villas* (1992) 11 Cal.App.4th 175, 233-235 [15 Cal.Rptr.2d 112]; *People v. Cribas* (1991) 231 Cal.App.3d 596, 611-612 [282 Cal.Rptr. 538].) These cases have adopted the rationale set forth in *People v. Jones, supra,* 180 Cal.App.3d at page 516, that the overt act required for conspiracy merely constitutes the theory of the case rather than an essential element of the offense: " 'In a conspiracy, the agreement to commit an unlawful act is not criminal until an overt act is committed, but when this happens and the association becomes an active force, it is the *agreement,* not the *overt act,* which is punishable. . . . [Citations.]' (Italics original.) [¶] Inasmuch as the overt act, though required to establish the existence of a conspiracy, is not an

actual element of the crime, it follows that the jury only need be unanimous in finding *an* overt act was done in furtherance of the conspiracy, not in finding a particular overt act was done. . . . Hence, the overt act is part of the 'theory' of the case, not an act constituting the offense." Accordingly, "a trial court need not instruct the jury they must unanimously agree as to the overt act done in pursuance of a conspiracy." (*Id.* at pp. 516-517.)

Other cases hold that the commission of an overt act is an essential element of conspiracy. (*People v. Brown* (1991) 226 Cal.App.3d 1361, 1369 [277 Cal.Rptr. 309]; *Feagles v. Superior Court* (1970) 11 Cal.App.3d 735, 739 [90 Cal.Rptr. 197].) As it is an essential element of the offense, the jury must unanimously agree on the overt act. (See *People v. Bratis* (1977) 73 Cal.App.3d 751, 763 [141 Cal.Rptr. 45]; *People v. Rehman* (1967) 253 Cal.App.2d 119, 157-158 [61 Cal.Rptr. 65].)

In *People v. Jackson* (1996) 13 Cal.4th 1164 [56 Cal.Rptr.2d 49, 920 P.2d 1254] (*Jackson*), the jury was asked to make three special findings on the three acts which the prosecutor argued were in furtherance of the murder conspiracy with which the defendant was charged. The jury found that the defendant committed all three acts. On appeal, the defendant claimed that the use of the special findings form violated sections 1150 and 1152, as well as his constitutional rights. The Supreme Court disagreed, since the jury had rendered a general verdict. The high court stated that "the use of special findings was a proper safeguard of defendant's right of due process, ensuring that the jury deliberating on a conspiracy charge agree unanimously on the same overt act or acts that are the basis of his culpability." (*Id.* at p. 1227.) The Supreme Court added in a footnote that "[w]hile recognizing that special findings may be used to secure jury unanimity on a defendant's commission of overt acts in connection with a conspiracy, we take no position on the question whether a defendant is *entitled* to a unanimity instruction in a conspiracy trial." (*Id.* at p. 1227, fn. 15, original italics.)

We believe that not requiring unanimity is the better and more logical view. As we quoted earlier from *Braverman, supra,* 317 U.S. at pages 53-54 [63 S.Ct. at pages 101-102]: "The gist of the crime of conspiracy . . . is the agreement or confederation of the conspirators to commit one or more unlawful acts 'where one or more of such parties do any act to effect the object of the conspiracy.' The overt act, without proof of which a charge of conspiracy cannot be submitted to the jury, may be that of only a single one of the conspirators and need not be itself a crime. [Citations.] . . . [¶] For when a single agreement to commit one or more substantive crimes is evidenced by an overt act, as the statute requires, the precise nature and

extent of the conspiracy must be determined by reference to the agreement which embraces and defines its objects. Whether the object of a single agreement is to commit one or many crimes, it is in either case that agreement which constitutes the conspiracy which the statute punishes. The one agreement cannot be taken to be several agreements and hence several conspiracies because it envisages the violation of several statutes rather than one. [¶] The allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for 'The conspiracy is the crime, and that is one, however diverse its objects.' [Citations.] *A conspiracy is not the commission of the crime which it contemplates,* and neither violates nor 'arises under' the statute whose violation is its object. [Citations.] Since the single continuing agreement, which is the conspiracy here, thus embraces its criminal objects, it differs from successive acts which violate a single penal statute and from a single act which violates two statutes. [Citations.] The single agreement is the prohibited conspiracy, and however diverse its objects it violates but a single statute." (Italics added.)

Because the agreement is the conspiracy, the diversity of the crimes that may be the object of the agreement should be of little, if any, consequence. Proof that the agreement has crime as its object should be enough. So long as there is unanimity that crime was the object of the agreement, conspiracy is established regardless of whether some jurors believe that crime to be murder and others believe that crime to be something else. "A requirement of jury unanimity typically applies to acts that could have been charged as separate offenses." (*People v. Beardslee* (1991) 53 Cal.3d 68, 92 [279 Cal.Rptr. 276, 806 P.2d 1311].) As stated in *Stoner v. Williams* (1996) 46 Cal.App.4th 986, 997 [54 Cal.Rptr.2d 243]: "[I]f only one criminal offense could exist as a result of the commission of various acts, the jury need not agree on which particular act (or legal theory) a criminal conviction is based, provided the jurors unanimously agree that all elements of the criminal offense are proved beyond a reasonable doubt."

To the same effect was the statement in *People v. Davis* (1992) 8 Cal.App.4th 28, 34 [10 Cal.Rptr.2d 381] (*Davis*): "It matters not that jurors may disagree over the theory of the crime, for example, whether the situation involves felony murder or premeditated murder. Nor does it matter that they disagree on the theory of participation, for example, whether there was direct participation or aiding and abetting or coconspiracy. Nor does it matter that they disagree about the facts proving any of these theories. If each juror concludes, based on legally applicable theories supported by substantial evidence, that the defendant is guilty of the charged offense, the defendant is properly found guilty even if the jurors disagree about the particular theories or facts."

*Davis* went on to say: "In California it is unnecessary jurors unanimously agree on the theory of criminal culpability supporting their unanimous conclusion of guilt. . . . [¶] . . . [¶] . . . [W]here there is a single offense and a single charge, it is the task of each juror to conclude, based perhaps on very different theories, whether the defendant is guilty or not guilty. It is simply of no consequence that some jurors believe the defendant is guilty based on one theory while others believe he is guilty on another even when the theories may be based on very different and even contradictory conclusions concerning, for example, the defendant's basic intent in committing the crime." (*Davis, supra,* 8 Cal.App.4th at pp. 44-45.)

In *People v. Santamaria* (1994) 8 Cal.4th 903, 918-919 [35 Cal.Rptr.2d 624, 884 P.2d 81] (*Santamaria*), the California Supreme Court explained: "It is settled that as long as each juror is convinced beyond a reasonable doubt that defendant is guilty of murder as that offense is defined by statute, it need not decide unanimously by which theory he is guilty. [Citations.] More specifically, the jury need not decide unanimously whether defendant was guilty as the aider and abettor or as the direct perpetrator. [Citations.] This rule of state law passes federal constitutional muster. [Citation.] [¶] . . . [¶] Not only is there no unanimity requirement as to the theory of guilt, the individual jurors themselves need not choose among the theories, so long as each is convinced of guilt. Sometimes, as probably occurred here, the jury simply cannot decide beyond a reasonable doubt exactly who did what. There may be a reasonable doubt that the defendant was the direct perpetrator, and a similar doubt that he was the aider and abettor, but no such doubt that he was one or the other."

*Santamaria* cited the following example to emphasize the rule: "In analyzing the unanimity question in a robbery case, one Court of Appeal used this example. ' "Assume a robbery with two masked participants in a store, one as the gunman and one as the lookout. If one witness makes a voice identification of the defendant as the gunman who demanded money, but other evidence, such as a fingerprint, suggests the defendant was actually holding the door open as lookout, the jury would be faced with the same theories presented in this case: find the defendant was the gunman and therefore a direct perpetrator, or find he was at the door and therefore an aider and abettor. Either way he would be guilty of robbery." If 12 jurors must agree on the role played by the defendant, the defendant may go free, even if the jurors all agree defendant committed the crime. That result is absurd.' [Citation.] Equally absurd would be to let the defendant go free because each individual juror had a reasonable doubt as to his exact role." (*Santamaria, supra,* 8 Cal.4th at p. 920, fn. 8.)

Even before *Santamaria,* the California Supreme Court had already observed: "If [defendant] intended that only possession of the property should

pass at the time of the sale, defendant was guilty of larceny by trick or device, but if [defendant] intended that title should pass, defendant was guilty of obtaining property by false pretenses. [Citations.] Irrespective of [defendant's] intent, however, defendant could be found guilty of theft by one means or another, and since by the verdict the jury determined that he did fraudulently appropriate the property, it is immaterial whether or not they agreed as to the technical pigeonhole into which the theft fell. [Citations.]" (*People v. Nor Woods* (1951) 37 Cal.2d 584, 586 [233 P.2d 897].)

Here, defendant was convicted of one conspiracy. The indictment described that conspiracy as a conspiracy to commit various crimes. Because any one of the crimes that was the object of the conspiracy was sufficient to establish the conspiracy, there were multiple theories upon which the prosecution could proceed. The existence of such multiple theories precluded a unanimity instruction. A unanimity instruction is inappropriate where multiple theories may provide the basis for a guilty verdict on one discrete criminal event. (*People v. Carpenter* (1997) 15 Cal.4th 312, 394 [63 Cal.Rptr.2d 1, 935 P.2d 708]; *Davis, supra*, 8 Cal.App.4th at pp. 41, 45.)

The case of *Richardson v. United States* (1999) 526 U.S. 813 [119 S.Ct. 1707, 143 L.Ed.2d 985] (*Richardson*), which defendant cites to us in a letter brief, is inapposite. In that case, the defendant was convicted of engaging in a continuing criminal enterprise under a federal criminal statute which forbids any person from " 'engag[ing] in a continuing criminal enterprise.' " The statute defines " 'continuing criminal enterprise' " as involving a " 'violat[ion]' " of drug statutes where " 'such violation is a part of a continuing series of violations.' " (*Id.* at p. 815 [119 S.Ct. at p. 1709].) Construing the federal statute, the United States Supreme Court determined that the statutory phrase "series of violations" "create[s] several elements, namely the several 'violations,' in respect to *each* of which the jury must agree unanimously and separately." (*Id.* at pp. 817-818 [119 S.Ct. at p. 1710], original italics.) Because each "violation" was an element of the crime, the jury had "to agree unanimously about which specific violations make up the 'continuing series of violations.' " (*Id.* at p. 815 [119 S.Ct. at p. 1709].)

Here, the specific crimes that constitute the object of the conspiracy are not elements of the conspiracy. Rather, they are the means by which the purpose of the conspiracy was to be achieved. Accordingly, the *Richardson* requirement of jury unanimity does not apply to them. (*Richardson, supra*, 526 U.S. at pp. 818-819 [119 S.Ct. at pp. 1710-1711].)

Recently, in *People v. Russo* (2001) 25 Cal.4th 1124, 1128 [108 Cal.Rptr.2d 436, 25 P.3d 641], the California Supreme Court settled the

question of "whether the jury must unanimously agree on a specific overt act," by holding that "the jury need not agree on a specific overt act as long as it unanimously finds beyond a reasonable doubt that some conspirator committed an overt act in furtherance of the conspiracy."

We conclude the trial court did not err when it refused to instruct the jury that it must unanimously decide whom, if anyone, defendant conspired to murder.

In any event, any error was invited. The record reflects that the prosecutor informed the court that it had prepared verdict forms that "sought to identify the targets for the conspiracy to commit murder," adding: "We still think there is an umbrella conspiracy and it's pretty obvious that there is. The NF is a group and they get together and they do all of these nefarious things. That's the object. But when it comes down to the particular subject matter of who they're planning to murder, that's why we put in the specific subjects of that particular object, object crime, otherwise, we think that we're in trouble on appeal." The attorney for codefendant Lopez argued to the court that the jury should only have to specify which of the object crimes a defendant conspired to commit, not the specific victim of that object crime. The prosecutor repeated that he wished the verdict form to specify whom, if anyone, a defendant conspired to kill.

The next day, counsel for Lopez objected to the prosecutor's proposed verdict, arguing that it was inconsistent to require specification for the target crime of murder and not for the other target crimes, which had more than one victim. Defendant joined Lopez's objection. The court, which had earlier agreed with the prosecution on what the verdict form should ask the jury to indicate, reversed itself and sustained defendant's and Lopez's objection, stating: "After reconsidering, I've come to the conclusion I was wrong. And it's my opinion that the jury need only be unanimous about the target crime, that they don't have to unanimously agree as to which event, nor does that have to be reflected in the jury verdict form, whether it be which murder or which robbery or which distribution of controlled substances."

Any error was therefore invited; consequently, defendant cannot complain. (*People v. Wickersham* (1982) 32 Cal.3d 307, 330 [185 Cal.Rptr. 436, 650 P.2d 311].)

Any error was also harmless. There is a split of authority on the proper standard for reviewing prejudice when the trial court fails to give a unanimity instruction. Some cases hold that the prejudice must be deemed harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18,

24 [87 S.Ct. 824, 828, 17 L.Ed.2d 705, 24 A.L.R.3d 1065] (*Chapman*). Other cases hold that the test is as enunciated in *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243] (*Watson*), which is whether "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error."

We think *Watson* provides the correct standard on the issue. That is because the requirement for jury unanimity in a criminal prosecution is a state constitutional requirement. (Cal. Const., art. I, § 16; *People v. Mickle* (1991) 54 Cal.3d 140, 178 [284 Cal.Rptr. 511, 814 P.2d 290]; *People v. Adames* (1997) 54 Cal.App.4th 198, 207 [62 Cal.Rptr.2d 631].) The United States Supreme Court "has never held jury unanimity to be a requisite of due process of law. Indeed, the Court has more than once expressly said that '[i]n criminal cases due process of law is not denied by a state law . . . which dispenses with the necessity of . . . unanimity in the verdict.'" (*Johnson v. Louisiana* (1972) 406 U.S. 356, 359 [92 S.Ct. 1620, 1623, 32 L.Ed.2d 152] (*Johnson*).) In *Johnson*, the high court, in fact, held that in Louisiana criminal verdicts rendered by nine out of twelve jurors are valid. (*Id.* at p. 363 [92 S.Ct. at p. 1625].) There being no right to a unanimous verdict under the United States Constitution, the question of whether defendant was entitled to a unanimity instruction is a state, not a federal, issue.

In any event, the jury found defendant guilty of the murder of Rosas. On the record facts, which show that defendant's participation in the murder of Rosas was in authorizing the murder, and there being no evidence in the record that defendant actually participated in the murder, or, being present, aided and abetted in the commission thereof, the guilty verdict on defendant for the murder of Rosas could only have been by reason of the jury unanimously finding that defendant had conspired to murder Rosas. Because of this implicit unanimous finding of conspiracy, it is not reasonably probable that defendant would have obtained a more favorable verdict had the unanimity instruction in question been given. For the same reason, any error was harmless even if the standard applied were the *Chapman* standard of harmless error beyond a reasonable doubt.

### Urango and Esparza Incidents

Defendant contends he was deprived of his Sixth and Fourteenth Amendment rights to due process and notice of the allegations that he conspired to murder or assault both Urango and Esparza, where he did not learn of these allegations until four months into trial. We disagree.

At the conclusion of the trial, the prosecution proposed a jury verdict form listing the conspiracy's potential victims. The list included Urango and

Esparza, whose names did not appear in the indictment as being involved in the alleged overt acts. Defendant objected to any reference to a conspiracy to murder to Urango and Esparza, arguing that defendant did not have notice of those charges because there was no grand jury testimony given and no overt acts alleged that defendant had conspired to kill either Urango or Esparza, and that the only evidence connecting defendant to the Urango and Esparza incidents came up during Salazar's trial testimony. Defendant argues the inclusion of Urango and Esparza in the prosecutor's verdict form violated defendant's constitutional right to be informed of the nature of the charges against him.

In our discussion on the requirement of jury unanimity, we concluded that the target crimes, that is specific crimes that constitute the object of the conspiracy, are not elements of the conspiracy; rather, they are only the means by which the purpose of the conspiracy was to be achieved. Because the Urango and Esparza incidents were not an element of the charged conspiracy, the prosecutor's reference added nothing to what the jury needed to reach a finding of conspiracy. The outcome would have been the same.

Consequently, any error was harmless, regardless of whether the standard of review applied is the *Chapman* standard of harmless error beyond a reasonable doubt, or the *Watson* standard of reasonable probability of a more favorable outcome.

### Constitutional Vagueness

Defendant contends his conviction for conspiracy to commit murder violates state and federal due process guarantees because a conspiracy to kill one of various persons without agreement upon who was to be killed is unconstitutionally vague and generic. The contention is without merit.

We have already determined that the trial court was not required to instruct the jury that it had to agree unanimously whom defendant conspired to kill. Such determination disposes of defendant's present contention, as well.

Defendant's reliance on *Suniga v. Bunnell* (9th Cir. 1993) 998 F.2d 664 (*Suniga*) is misplaced. Due process was implicated in *Suniga* because there was in that case one theory of liability upon which the jury was instructed that did not exist in California law. We do not have such a situation here.

In any event, any error was harmless because, as discussed, by finding defendant guilty of the murder of Rosas on the record facts, the jury had also to find unanimously that defendant had conspired to murder Rosas.

*Sufficiency of Evidence*

 Defendant contends his conviction for conspiracy to commit murder must be reversed for constitutionally insufficient evidence because this court cannot determine whether or not the jury found him guilty of conspiring to kill a person, for which conspiracy there is constitutionally sufficient evidence in support of conviction. The contention is without merit.

Again, we have already determined that the jury was correctly instructed that it did not need to agree unanimously on which particular murder defendant conspired to commit so long as it unanimously agreed that defendant conspired to commit murder as the object of the conspiracy. The jury subsequently found defendant guilty of the Rosas murder. The guilty finding on the Rosas murder could have only been reached by a unanimous jury finding that defendant conspired to kill Rosas. That unanimous conspiracy finding was sufficient to support the guilty finding on the single conspiracy count.

Moreover, where the jury is presented with several factual theories for conviction, some of which are predicated upon insufficient evidence, "the appellate court should affirm the judgment unless a review of the entire record affirmatively demonstrates a reasonable probability that the jury in fact found the defendant guilty solely on the unsupported theory." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1130 [17 Cal.Rptr.2d 365, 847 P.2d 45].) The Rosas murder conviction eliminates such a probability.

*Withdrawal Instruction*

 Defendant contends the trial court violated his state and federal constitutional rights to due process and a fair trial by jury by refusing to give the modified withdrawal instruction that he requested, which was supported by the evidence and which pinpointed the defense theory of the case. The contention is without merit.

Defendant requested the court to give a modified version of CALJIC No. 6.20, reading as follows: "Any member of a conspiracy may withdraw from and cease to be a party to the conspiracy, but [his] [her] liability for the acts of [his] [her] co-conspirators continues until [he] [she] effectively withdraws from the conspiracy. [¶] Withdrawal may be communicated by an affirmative act bringing home the fact of [his] [her] withdrawal to [his] [her]

companions. The affirmative act must be made in time for [his] [her] companions to effectively abandon the conspiracy and in a way which would be sufficient to inform a reasonable person of the withdrawal. [¶] In order to effectively withdraw from a conspiracy, there must be an affirmative and bona fide rejection or repudiation of the conspiracy which must be communicated to the other conspirators of whom [he] [she] has knowledge. [¶] If a member of a conspiracy has effectively withdrawn from the conspiracy [he] [she] is not thereafter liable for any act of the co-conspirators committed subsequent to [his] [her] withdrawal from the conspiracy, but [he] [she] is not relieved of responsibility for the acts of [his] [her] co-conspirators committed while [he] [she] was a member. [¶] If the evidence raises a reasonable doubt as to whether the defendant withdrew from the conspiracy, you must find that [he] [she] did withdraw."

The court refused defendant's request and gave instead the unmodified version of CALJIC No. 6.20, as follows: "A member of a conspiracy is liable for the acts and declarations of his co-conspirators until he effectively withdraws from the conspiracy or the conspiracy has terminated. [¶] In order to effectively withdraw from a conspiracy, there must be an affirmative and good faith rejection or repudiation of the conspiracy which must be communicated to the other conspirators of whom he has knowledge. [¶] If a member of a conspiracy has effectively withdrawn from the conspiracy he is not thereafter liable for any act of the co-conspirators committed after his withdrawal from the conspiracy, but he is not relieved of responsibility for the acts of his co-conspirators committed while he was a member."

Defendant argues that the requested modification should have been granted because without the requested modification "[t]he instruction given could be and probably was interpreted to require that withdrawal from a conspiracy be by oral communication," adding that "[t]his is not correct—one may withdraw from a conspiracy by an 'affirmative act' as well."

The flaw in the argument is that the unmodified version given by the court did not require, and could not be misinterpreted as requiring, that the withdrawal from the conspiracy had to be *orally* communicated to the coconspirators. As given, the instruction merely required that there be "an affirmative and good faith rejection or repudiation of the conspiracy which must be communicated to the other conspirators of whom he has knowledge." An "affirmative" act need not be oral. We do not see how the language of defendant's proposed instruction differed from the unmodified version in this regard since both versions used the word "affirmative," and the word "oral" did not appear in either version.

Moreover, defendant's proposed version created more problems than it attempted to solve. For example, defendant's version used the word "companions" for "coconspirators." "Companions" is a word without a settled

legal definition, and one with loose meaning. "Companions" are not necessarily "coconspirators" within the meaning of California's penal statutes. What exactly did defendant mean by "companions"? Defendant's proposed version did not define the term.

Defendant's proposed modification also provided that "[t]he affirmative act must be made in time for [his] [her] *companions* to effectively abandon the conspiracy and in a way which would be sufficient to inform a *reasonable person* of the withdrawal." (Italics added.) The addition of the "reasonable person" standard to the instruction is highly questionable. Defendant has cited no authority requiring the use of such a standard.

We conclude the trial court did not err in rejecting defendant's proposed modification to CALJIC No. 6.20, and in giving CALJIC No. 6.20 to the jury without modification.

### *Prosecutorial Misconduct*

 Defendant contends the prosecutor committed prejudicial misconduct and deprived defendant of his state and federal constitutional rights to due process and a fair trial by making an inflammatory comment and ungrounded attack on defense counsel in closing argument. We disagree.

Prosecutors Charles Constantinides and Catherine Constantinides handled the prosecution in this case. At the closing argument, Mr. Constantinides delivered one part of the argument, and Ms. Constantinides delivered the other part. During her part of the prosecution's final argument, Ms. Constantinides addressed the jury, and the following colloquy transpired:

"Ms. CONSTANTINIDES: . . . There was one portion of Mr. Provini's argument which Charles [Constantinides] did not address because I asked him not to because this is really my issue for two reasons. It's the part about the Beto Jasso hit, and then that letter that—or excuse me—that statement that Lopez makes that correctional officer Gabrielson overhears. Let me show you first what Mr. Provini said about that. [¶] This is what he said. He first pointed out to you that certainly you may decide that Bobby Lopez was part of a plan or conspiracy to kill Beto Jasso, he seems to have conceded that. But he continued and he made four statements on four consecutive pages that *seemed kind of personal.* [¶] First he told you that you should convict Lopez because you believe Robert Rios on that count. Don't convict because of some testimony by officer Gabrielson about a comment which after any kind of critical analysis becomes *obvious to probably any intelligent lawyer.* [¶] Those are his words. He went on to the next page to say: Don't

convict Bobby Lopez because of a fallacious argument put up on the chart. [¶] Then he said on the following page: I think it's *obvious to any lawyer who looks at this closely* or any lay person or any juror who looks at this. [¶] Then finally on the last page regarding this subject he says: So *anybody with any kind of powers of reasoning would understand.* [¶] Now, ladies and gentlemen, you'll recall that part of the Beto Jasso support that we gave you, that I gave you, that I put up on this machine and flashed it up not on the wall but rather on a screen was that comment by Beto Jasso. [¶] What is going on here? They teach you in law school, and I remember because I'm much closer to it than any other lawyer in this room, that if you can't argue regarding the facts, if the facts aren't any good, then you argue the law. If the law is not any good for your side, then you argue the facts. And if the facts and the law are no good for you, you just stand up and argue. [¶] Well, ladies and gentlemen, they don't ever teach you to dog out your opponent like that. What is going on here? Is it sexism? Is it racism?

"MR. PROVINI [counsel for codefendant Lopez]: Objection.

"MS. CONSTANTINIDES: It is ageism?

"MR. PROVINI: It's just a comment on the evidence.

"THE COURT: Overruled.

"MS. CONSTANTINIDES: What is going on here, ladies and gentlemen? The youngster, Mexican-American female prosecutor didn't blow it, and this is how she didn't blow it." (Italics added.)

Ms. Constantinides then proceeded to discuss the evidence to argue for guilty verdicts.

At the break, defendant moved for a mistrial on the ground that Ms. Constantinides's argument "injected gender bias and racial bias." The prosecution responded that "not only is there support in the record for the comments, but there was no timely objection. And it's certainly fair rebuttal." The court found the objection timely, but denied the motion for a mistrial.

First, the contention is barred. In *People v. Montiel* (1993) 5 Cal.4th 877, 914 [21 Cal.Rptr.2d 705, 855 P.2d 1277], where trial counsel objected to the prosecutor's remarks, but did not additionally request an admonition that would have cured any harm, the court held: "[T]rial counsel failed to preserve a direct claim of misconduct because, although he objected to the

prosecutor's remarks, he did not also request an admonition that would clearly have cured any harm. [Citations.]"

Similarly, in *People v. Gionis* (1995) 9 Cal.4th 1196, 1215 [40 Cal.Rptr.2d 456, 892 P.2d 1199] (*Gionis*), the court stated: "[A] reviewing court will not review a claim of misconduct in the absence of an objection and request for admonishment at trial. 'To preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm caused by the misconduct.' [Citations.]"

Here, there is no showing that the claimed harm would not have been cured by an appropriate admonition.

Second, we agree with the People that Ms. Constantinides's comments were fair rebuttal. The defense invited the rebuttal by making uncalled-for remarks about Ms. Constantinides's intelligence and competence. When the defense suggested that Ms. Constantinides was not intelligent enough because she could not see a point that was obvious to any intelligent lawyer, and because she failed to comprehend something that anybody with any kind of powers of reasoning could understand, the suggestion was personal, unnecessary, and derogatory, justifying a response to vindicate the prosecutor's wounded pride. The personal and professional hurt that Ms. Constantinides felt is evident from her explanation to the court: "From the beginning of the trial I've had to hold my tongue. I say that because when I was examining some witnesses very early on in the first week or so, I was up there and I was doing something with the witness, and Mr. Selvin objected. And on the record he said, I don't know if she knows the Evidence Code but this is improper. And then the court responded, well, no, actually I sustained your objection, and so now she's going about it a different way. And what I was doing was very proper. But it raised the specter early, early on. I don't know if she knows the Evidence Code. [¶] Well, what is that all about? I mean do I not know the Evidence Code? Why wouldn't I know that? Mr. Selvin would never say that about Mr. Constantinides, absolutely not. Why wouldn't he, because Mr. Constantinides has lots of experience maybe."

Having invited the rebuttal, the defense cannot complain.

Third, assuming the comments were improper, they were not egregious enough to warrant reversal. " 'A prosecutor's rude and intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." [Citations.] But conduct by a

prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " [Citations.] Included within the deceptive or reprehensible methods we have held to constitute prosecutorial misconduct are personal attacks on the integrity of opposing counsel. [Citation.]' [Citation.]" (*Gionis, supra,* 9 Cal.4th at pp. 1214-1215.)

 Fourth, the prosecutor did not comment on the race, or sex, or age of defendant; rather, she commented on her own race, sex, and age, as they might have affected opposing counsel's, and the court's and jury's, regard for her. There is no showing in the record that the prosecutor's comments prejudiced defendant. " 'It is settled that a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.] It is also clear that counsel during summation may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature.' [Citation.] 'A prosecutor may "vigorously argue his case and is not limited to 'Chesterfieldian politeness' " [citation], and he may "use appropriate epithets warranted by the evidence." ' [Citations.]" (*People v. Wharton* (1991) 53 Cal.3d 522, 567-568 [280 Cal.Rptr. 631, 809 P.2d 290].)

 Although the prosecutor's comments were not directly on the evidence, they pertained to how the evidence might be unfairly viewed by the jury because of her own supposed inability to understand and analyze the evidence correctly.

Fifth, "[p]rosecutorial misconduct implies the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." (*People v. Strickland* (1974) 11 Cal.3d 946, 955 [114 Cal.Rptr. 632, 523 P.2d 672].) "To establish prosecutorial misconduct, it is not necessary to show the prosecutor acted in bad faith, but it is necessary to show the right to a fair trial was prejudiced. [Citation.]" (*People v. Nguyen* (1995) 40 Cal.App.4th 28, 35-36 [46 Cal.Rptr.2d 840].) "What is crucial to a claim of prosecutorial misconduct is not the good faith *vel non* of the prosecutor, but the potential injury to the defendant." (*People v. Benson* (1990) 52 Cal.3d 754, 793 [276 Cal.Rptr. 827, 802 P.2d 330].) Defendant has not carried his burden in this regard.

The case of *People v. Kirkes* (1952) 39 Cal.2d 719 [249 P.2d 1] (*Kirkes*), relied on by defendant for the proposition that it is misconduct to argue to

the jury facts which are not in evidence, is inapposite. The prosecutor in *Kirkes* implied a fact not in evidence to connect the defendant to the crime. Nothing in Ms. Constantinides's challenged statements connected defendant to the charges.

We conclude the challenged comments did not constitute prosecutorial conduct, and that, in any event, the issue is waived.

*Section 654*

■■■ Defendant contends he was improperly sentenced to consecutive terms of 25 years to life for both the Rosas murder conviction and for the conspiracy to commit murder, in violation of section 654. The contention is without merit.

Section 654, subdivision (a), provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other."

■■■ In *Neal v. State of California* (1960) 55 Cal.2d 11, 18-19 [9 Cal.Rptr. 607, 357 P.2d 839], the court, interpreting this provision, stated: "The proscription of section 654 against multiple punishment of a single act, however, is not limited to necessarily included offenses. [Citations.] In *People* v. *Knowles* [(1950)] 35 Cal.2d 175, 187 [217 P.2d 1], we stated: 'If a course of criminal conduct causes the commission of more than one offense, each of which can be committed without committing any other, the applicability of section 654 will depend upon whether a separate and distinct act can be established as the basis of each conviction, or whether a single act has been so committed that more than one statute has been violated. If only a single act is charged as the basis of the multiple convictions, only one conviction can be affirmed, notwithstanding that the offenses are not necessarily included offenses. It is the singleness of the act and not of the offense that is determinative.' . . . [¶] Few if any crimes, however, are the result of a single physical act. . . . [¶] Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one."

With respect to conspiracy, the rule was well summarized in *People v. Ramirez* (1987) 189 Cal.App.3d 603, 615-616 [236 Cal.Rptr. 404], as follows: "Because of the prohibition against multiple punishment in section

654, a defendant may not be sentenced 'for conspiracy to commit several crimes and for each of those crimes where the conspiracy had no objective apart from those crimes. If, however, a conspiracy had an objective apart from an offense for which the defendant is punished, he may properly be sentenced for the conspiracy as well as for that offense.' [Citations.] Thus, punishment for both conspiracy and the underlying substantive offense has been held impermissible when the conspiracy contemplated only the act performed in the substantive offense [citations], or when the substantive offenses are the means by which the conspiracy is carried out [citation]. Punishment for both conspiracy and substantive offenses has been upheld when the conspiracy has broader or different objectives from the specific substantive offenses. [Citations.] [Fn. omitted.]"

Here, there is strong evidence that the NF, of which defendant was a member, conspired to kill not only Rosas, but other persons as well, in addition to the gang's overriding conspiracy discussed *ante*.

We conclude the trial court did not err in not applying section 654, and in sentencing defendant to consecutive life terms for the Rosas murder and the conspiracy to commit murder.

DISPOSITION

The judgment is affirmed.

Bamattre-Manoukian, J., and Wunderlich, J., concurred.

A petition for a rehearing was denied September 4, 2001, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied November 14, 2001.